**In re HOLLY HILL MEDICAL CENTER, INC., d/b/a Daytona Beach General Hospital and Holly Hill Pharmacy, Debtor.**

**William F. BEEMER, Trustee, Plaintiff,**

v.

**WALTER E. HELLER AND COMPANY a/k/a Heller Mortgage Company, a/k/a Walter E. Heller and Company Southeast, Inc., Defendant.**

Bankruptcy No. 82–1156–Orl–BK–GP.
Adv. No. 83–80.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Nov. 30, 1984.

Jack H. Zinkow, Orlando, Fla., for plaintiff.

Robert L. Young, Orlando, Fla., for defendant.

MEMORANDUM OPINION

GEORGE L. PROCTOR, Bankruptcy Judge.

This factually unusual fraudulent transfer proceeding presents a scenario of a creditor who has received interest payments from a debtor, which payments were clearly on account of credit extended to a third party for the benefit of the debtor. No contractual debtor-creditor relationship at any time existed between the debtor and the defendant. The picture is further complicated by the third party having used the loan principal as collateral for a second loan from another institution, the proceeds of which were used by the debtor. The complaint asks that the Court find that interest payments made by the debtor to the defendant after October 14, 1981, totaling $156,029.60, constitute fraudulent transfers under 11 U.S.C. § 548. Although the plaintiff argues his case skillfully, the Court concludes that, a judgment in favor of the plaintiff would not be in accordance with the terms of § 548 in that the debtor received reasonably equivalent value for interest payments made to the defendant.

A trial on the issues was held on June 7, 1984. In evidence, on the stipulation of the parties, is the deposition of Gary Crandon, president of the debtor corporation. It is undisputed that the subject payments were made within the year preceding the debtor's filing of its bankruptcy petition on August 8, 1982.

The debtor was incorporated under Florida law on June 29, 1981. The corporation was created in order to acquire and operate Daytona Beach General Hospital. On June 30, 1981, the debtor and the owners of the hospital entered into two agreements: a lease of the hospital and an option to purchase in favor of the debtor (which option was never exercised and ultimately expired).

Gary L. Crandon, a 42½ percent shareholder in the debtor, was the principal shareholder in Crandon Enterprises, an electrical contracting company based in Miami. He was not an officer of the debtor

at the inception of the subject transactions, but early in 1982, became president of the debtor.

On July 27, 1981, Crandon Enterprises borrowed $750,000 from the defendant, Walter Heller, Inc., a commercial lender. The loan was taken strictly to fund the operation of the debtor, and there is no suggestion in evidence or argument that the money was utilized for the benefit of Crandon Enterprises. The defendant took a second mortgage on certain Miami realty owned by Crandon Enterprises security for the loan. It took no security interest in property owned by the debtor, which perhaps reflected that the debtor had no substantial assets except the value of the option to purchase the hospital.

On October 14, 1981, apparently motivated by federal regulations which made the debtor's relationship with Crandon Enterprises an impediment to the debtor receiving reimbursement for medical services under government insurance programs, the debtor 1) paid back to Crandon Enterprises the $750,000 which it technically owed Crandon, and for which Crandon had served as a conduit from the defendant; instead of in turn paying the principal back to the defendant, Crandon Enterprises 2) used the $750,000 to purchase in its own name a certificate of deposit from the Atlantic Bank. Crandon Enterprises then, using the certificate of deposit purchased with funds loaned by the defendant as collateral, 3) obtained a $750,000 loan from the Atlantic Bank, and 4) loaned that money back to the debtor.

The funds at issue are the interest payments made after that series of transactions. Despite the fact that no formal debtor-creditor relationship had been entered into by the debtor and the defendant, all interest checks due under the terms of the loan were drawn on the debtor's bank account and were sent directly to the defendant with no intermediary.

The plaintiff points out that the October 14, 1981, transaction put the debtor in the position of having to make double interest payments, i.e. to the defendant and to Atlantic Bank for the same amount of money it had had access to prior to the transactions. The defendant counters that it is not responsible for lapses in business judgment on the part of the debtor or related companies.

The plaintiff argues that after the transactions of on or about October 14, 1981, the Atlantic Bank, rather than the defendant, was the origin of the operating capital which the debtor used. The defendant points out that it did not regain control of the money and again responds that it should not be held responsible for the business decisions of others. The defendant analogizes to the "shell and pea" game and argues that the "pea" at every point after the initial loan by the defendant was made, was simply the principal sum originally advanced by the defendant to Crandon Enterprises.

It appears to the Court that: 1) it was at all times understood by all parties that the loan from the defendant to Crandon Enterprises was for the benefit of the debtor; 2) the defendant was owed interest at the contract rate by Crandon Enterprises, but Crandon at no point paid interest to the defendant—the only source of such payments was the debtor; (3) the interest payments did not constitute gratuities in that the debtor at all times had the benefit of the initial loan from the defendant to Crandon Enterprises.

Crandon Enterprises *also* enjoyed some benefit from the debtor's payment of the obligation which was technically that of Crandon Enterprises—Crandon was obviously spared the necessity of paying the debt itself, and from any remedies, including foreclosure on the Miami property, of which the defendant might have availed itself in the event of non-payment. The question, however, is not whether Crandon, in addition to the debtor, gained some advantage on account of the debtor making the payments. It is whether the debtor gained *from the defendant* a value reasonably equivalent to its interest payments.

The plaintiff does not suggest that, had the debtor been the borrower and the de-

fendant the sole lender in a simple two-sided transaction, he as trustee would be able to recover any payments as fraudulent transfers—clearly the debtor would be deemed to have received reasonably equivalent value in the form of use of the money loaned it.

It is well decided and indeed an inescapable conclusion under the language of § 548 that transfers by a debtor which operate solely or principally to benefit an affiliated entity, constitute fraudulent transfers when the other elements of fraudulent transfer status are present, 4 *Collier on Bankruptcy* ¶ 67.33. Where, however, a tripartite relationship exists, but analysis of the facts demonstrates that the debtor nonetheless receives reasonably equivalent value, case law seems clear to the effect that, "a debtor may sometimes receive 'fair' consideration even though the consideration given for his property or obligation goes initially to a third person," *Rubin v. Manufacturers Hanover Trust Co.* 661 F.2d 979 (2nd Cir.1981). (*Rubin* alludes to "fair consideration" rather than "reasonably equivalent value" because it was decided under § 67(d)(1)(e) of the Bankruptcy Act, and the "fair consideration" terminology originated with § 548 of the Code. We are satisfied that the terms have very similar meanings.) "Benefit need not be direct; it may come indirectly through a third person." *Klien v. Tabatchnick,* 610 F.2d 1043 (2d Cir.1979), citing *Williams v. Twin City Co.,* 251 F.2d 678, 681 (9th Cir.1958), *Mandel v. Scanlon,* 426 F.Supp. 519, 523–23 (W.D.Pa.1977); *McNellis v. Raymond,* 287 F.Supp. 232 (N.D.N.Y.1968), rev'd on other grounds, 420 F.2d 51 (2d Cir.1970); *Hofler v. Marion Lumber,* 233 F.Supp. 540, 543 (E.D.S.C. 1964). Having determined that the indirectness of benefit to a debtor does not establish lack of reasonably equivalent value, we must ask 1) whether the instant facts lead to a conclusion that the debtor received from Heller, however indirectly, a benefit for which the interest payments represented no more than a fair exchange, and 2) whether the interposition of the Atlantic Bank into the chain of borrowers and lenders transforms the value given by Heller from equivalent to non-equivalent.

We find not only that reasonably equivalent value existed before October 14, 1982, we find as well that it was not diminished by the entry of the Atlantic Bank into the picture. The Atlantic Bank loan could not have been obtained without the availability of the funds advanced by the defendant. The benefit of the funds to the debtor was decreased in that the interest burden was greatly increased, but that is in no way attributable to the defendant.

The plaintiff argues that after the source of the loan to the debtor from Crandon Enterprises ceased to be the defendant and became the Atlantic Bank, the defendant was no longer providing a "reasonably equivalent value" in exchange for the interest payments.

The proposition that Atlantic Bank became the true origin of the money after the October 14, 1981, transactions contains two fallacies. First, the defendant was not repaid the principal of the loan by either the debtor or Crandon Enterprises. The $750,-000 that the defendant had loaned Crandon Enterprises for the benefit of the debtor remained outside the control of the defendant, and within the control of the debtor and Crandon Enterprises. Second, the value represented by the Heller loan was a prerequisite to obtaining the Atlantic Bank loan. Gary Crandon testified at trial that at the time of the Atlantic Bank transactions, the debtor had no borrowing power. The finding that the continued use of the $750,000 was necessary in order to obtain a loan from the Atlantic Bank is not to say that the loan might not have been restructured to create a debtor-creditor relationship between the debtor and the defendant, with Crandon Enterprises remaining as a guarantor, or that such an approach would not have been more intelligent. The fact remains that Crandon, acting on behalf of Holly Hill, formulated the goal of obtaining a loan from the Atlantic Bank without repaying the defendant. However ill-considered that goal may have been, it was a business decision entered into on behalf of

the debtor and could not have been effectuated without use of the money advanced by the defendant.

The argument that the necessity of paying double interest after the second loan in effect wiped out the value of the first loan has some superficial practical validity, but will not withstand close analysis. Had Crandon Enterprises buried the $750,000 under the foundation of the Daytona Beach General Hospital, it might be argued that the debtor had not had received reasonably equivalent value for its interest payments, in that the money would have been totally unproductive. The Court belives that the correct response is that the reasonably equivalent value for the continuing interest payments was access to the money for whatever use the borrower chose to make on behalf of the debtor. The criterion for whether a debtor received reasonably equivalent value cannot in any instance be whether the debtor used sound judgment in exploiting what it received to the best advantage. As a practical matter, in a bankruptcy context, we could rarely find that optimum use of borrowed funds had been made. Far more importantly, that approach is supported by neither logic nor fairness. The debtor received in the first instance $750,000 worth of potential benefit. Whether borrowed money is used brilliantly or wasted by the recipient does not inflate or reduce its value from the lender's standpoint, unless as is not the case in this instance, the parties have agreed that the lender's return is in some way contingent on the success of the enterprise.

Thus, this Court cannot see how the role played by the Atlantic Bank materially changes the relative postures of the debtor and the defendant. The defendant extended a sum of money to Crandon Enterprises, strictly for the use and benefit of the debtor. When Atlantic Bank took its place in the chain of transactions, the defendant was still without its $750,000, and the debtor still had as much access to the principal sum as ever. That the Atlantic Bank also extended a loan to Crandon Enterprises for the benefit of the debtor, and was also

entitled to interest payments does not alter those essential facts.

In that the plaintiff has not established that the debtor failed to receive reasonably equivalent value for interest payments to the defendant, the Court need not reach the question of whether the debtor was insolvent when the payments were made.

A final judgment in accordance with this Opinion has been separately entered this date.