**In re ANTINARELLI ENTERPRISES, INC., d/b/a Sound Advice, Debtor.**

**John F. CULLEN, trustee of the Estate of Antinarelli Enterprises, Inc., Plaintiff,**

**v.**

**TDK ELECTRONICS CORPORATION, Defendant.**

**Bankruptcy No. 84–1363–HL.
Adv. No. 86–1399.**

United States Bankruptcy Court, D. Massachusetts.

July 21, 1987.

John F. Cullen, trustee Cullen & O'Connell, Boston, Mass.

Christopher W. Parker, Craig & Macauley, Boston, Mass., for TDK Electronics.

## MEMORANDUM OF FINDINGS AND RULINGS ON PREFERENCES

HAROLD LAVIEN, Bankruptcy Judge.

The Chapter 7 Trustee brought this action to recover alleged preferential transfers, pursuant to 11 U.S.C. § 547(b) [1], received by the defendant, TDK Electronics Corporation ("TDK"). The defendant supplied the debtor with video and audio tapes from the debtor. The trustee questions the propriety of the following payments:

| | Amount | Invoice Date | Payment Deposited |
|---|---|---|---|
| 1) | $ 21,208.58 | 4/17/84 & 4/30/84 | 7/30/84 |
| 2) | 487,020.77 | 5/31/84 | 7/31/84 |
| 3) | 491,155.96 | 6/18/84 & 6/30/84 | 8/31/84 |
| 4) | 204,545.67 | 5/31/84 | 9/11/84 |
| 5) | 100,000.00 | | 9/25/84 |

Both the 9/11/84 and 9/28/84 payments were made by wire transfer. All other payments indicated were made by check. TDK denies that the above payments were preferential transfers. A two-day trial was

---

1. § 547. Preferences

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

held in this matter, on February 3 and 4, 1987. Both parties have submitted briefs.

The debtor and TDK had a business relationship beginning in 1981, continuing through and until the involuntary bankruptcy filing on October 22, 1984. At the time of the relevant transactions, the payment schedule called for on TDK's invoices was "Net 60 end of month." The Court received testimony as to the prevailing meaning within the trade of the term "Net 60 end of month." Testimony was also offered as to the customary course of payment operating between the parties, if different than "Net 60 end of month."

TDK defends against the trustee's claims, finding its support within the exemptions to preferential transfers delineated in 11 U.S.C. § 547(c). More specifically, TDK claims that four of the five payments were made in the ordinary course of business under 11 U.S.C. § 547(c)(2), namely, the $21,208.58 payment made on July 30, 1984, the $487,020.77 payment made on July 31, 1984, the $491,155.96 payment made on August 31, 1984, and the $204,545.67 payment made on September 11, 1984. TDK further states that the $204,545.67 payment made on September 11, 1984 and the $100,000 payment made on September 28, 1984 were in exchange for unsecured and unpaid for new value shipped to the debtor and are exempt under 11 U.S.C. § 547(c)(4). Finally, TDK claims that the $100,000 payment of September 28, 1984 was a contemporaneous exchange for new value, exempt under 11 U.S.C. § 547(c)(1). All of these defenses are refuted by the trustee.

■ As to the meaning of the term "Net 60 end of month", this Court finds that the plain meaning of the word is its intended meaning. The Court reads the term to mean, that in any given month in which a shipment was made, payment was due 60 days from the end of the month in which the invoice was dated. To use the example as offered at trial, if an invoice was dated June 1, the debtor would have until August 31 to make payment and still be timely. TDK would have the Court believe that the actual meaning of the term is 90 days end

of month. The trustee urges the Court to read the term as meaning a period of 60 days, with no additional time involved. The testimony offered at trial does not support the meaning given by either side. Mr. Antinarelli testified that the payment term required payment 60 days after the end of month. Neither of TDK's two witnesses' testimony supports the meaning as suggested by its counsel. Actually, it appears from the testimony of Mr. Charles Thompson, National Credit Manager for TDK, that the custom in the trade was to interpret any "net" term to mean from the end of the month in which the invoice is dated. Ambiguity in a contract is construed against the maker, and since TDK prepared the invoice, it must bear the consequences of its choice of language.

As to arrangements for payment which were either different than "Net 60 end of month", or would shed light on its meaning, it is abundantly clear that TDK disapproved of payments stretching out to 90 days. Mr. Antinarelli testified at trial that if payments had not been made by a few days before the 60 days, he would receive phone calls from TDK's credit department. Another technique employed by TDK to avoid late payments was to require the debtor to submit post-dated checks anywhere from seven to 14 days prior to the 60–day due date. Another argument proposed by TDK in favor of finding a 90–day payment to be the ordinary business terms between itself and the debtor is its policy of giving a 5% or 6% cash discount if payments were timely made. TDK asserts that the discount was applied to all but the $100,000 wire transfer on September 28, 1984. It was clear from the testimony offered at trial that TDK, as good business, would award this discount whether or not payments were timely. In fact, buyers had come to rely on the discount and factored it into the price in determining the cost of the product. It also appeared in evidence that TDK had previously invoiced net 30 end of month and changed to net 60 end of month, indicating that if it wanted to make a further change to net 90 end of month, it knew to effect it from past experience. Further, TDK offered testimony of

the practice in the trade and showed not only a non-uniformed practice, but further indicated that firms using a 90–day period so indicated on their invoices.

Given the Court's ruling as to the clear meaning of the payment term, "net 60 end of month", and the custom of practice between the parties and in the trade, the payments in the amount of $487,020.77 and $491,155.96 were received within 60 days of the end of the invoice month and, therefore, TDK received the monies within the ordinary course of business.

■ The next payment to be addressed is the $21,208.58 paid on July 30, 1984 for two invoices dated April 17 and 30, 1984. This payment was made more than 60 days from the end of April. However, at trial, Mr. Antinarelli explained the circumstances causing the delay in this payment to be within the ordinary course of the parties' business arrangement. He stated that he held off paying TDK because they had delayed in posting over $100,000 worth of credits to his account. This explanation is perfectly reasonable and, in this Court's view, commonly accepted business practice. TDK will be allowed to keep the $21,208.58 in light of the surrounding circumstances as having been paid in the ordinary course of business.

■ As regards the $100,000 payment made on September 23, 1984, TDK claims the debtor received a contemporaneous delivery of goods and new value, and as a result, the payments may not be avoided by the trustee pursuant to 11 U.S.C. § 547(c)(1) and (c)(4). First, in support of its defense under 11 U.S.C. § 547(c)(1), TDK asserts that it had clearly refused to make any additional shipments to the debtor unless it received a wire transfer of $100,000, and only when the funds were received on September 28, 1984, did TDK deliver goods in the amount of $299,050 to the debtor. TDK claims that this under-standing between the parties was memorialized in a letter signed by both parties, dated September 27, 1984. However, TDK fails to fully quote in its brief the relevant portions of the September 27, 1984 letter. It is absolutely clear on a reading of the entire letter, that the $100,000 wire transfer was a matter separate and apart from the shipment of September 28th. In fact, the only reference to this payment is included in a separately numbered paragraph from the paragraph dealing with the shipment and necessary payments.[2] TDK claims that Mr. Antinarelli testified at his deposition that the $100,000 payment was earmarked specifically as consideration for the September 28th delivery. The passages cited by TDK are unclear as to what, specifically, Mr. Antinarelli testified to other than that part of the arrangement that he reached with TDK, was that he would make a wire transfer of $100,000 and another part of the arrangement was the shipment and payment. The letter agreement is perfectly clear. TDK wanted the balance accumulated as far back as 1981 cleared up and a procedure to do that was initiated. In fact, the list of payments including the $100,000 required by the letter agreement, approximates the $1,300,000 of old indebtedness. The trustee cites to the trial testimony of Mr. Antinarelli regarding the intended consideration for which the $100,000 payment was made which, he states, was to reduce his account balance. The intent of the parties must control as to the contemporaneous nature of a payment, *Matter of Prescott*, 805 F.2d 719 (7th Cir. 1986). The intent of the parties for the $100,000 payment to be applied on account, as opposed to in payment for the September 28th shipment is clear in the distinct treatment the payment was given both by the parties in their letter and TDK's counsel in the deposition and trial questioning and the responses.[3]

---

**2.** *See* copy of letter dated September 27, 1984 by Yutaka Mori, Director Operations and Credit, agreed to on September 28th by president of debtor corporation, and addressed to debtor corporation to attention of Mr. Angelo Antinarelli.

**3.** "... it makes no sense to presume that Cross followed a method of accounting that flies in the face of the typical business practice of applying payments to the earliest receivable." *In re Cross Baking Co., Inc.*, 818 F.2d 1027, 1031 (1st Cir.1987).

■ TDK further defends its receipt of the $100,000 under 11 U.S.C. § 547(c)(4), which calls for a receipt of new value by the debtor. The Court has determined that the debtor did not receive new value in exchange for these monies, as discussed below, the so-called new value was secured.

TDK also defends its receipt of the $204,-545.67 payment on September 11, 1987 for invoices dated May 31, 1984 on the basis of 11 U.S.C. § 547(c)(4). TDK acknowledges that when made, the payment was fully secured under an agreement entered into by the parties on July 5, 1983 by which TDK received a purchase money security interest in the products purchased by the debtor and a security interest in the accounts receivable, and proceeds generated from the sale of the TDK products. There is no question that this agreement was in place in September of 1984 and that TDK was fully secured at the time of transfer. However, TDK claims that because it is presently undersecured on these claims, it should be considered to have given the debtor new unsecured value. In support of its position, TDK cites one case *In re Formed Tubes*, 46 B.R. 645, 12 B.C.D. 960 (E.D.Mich.1985) which is distinguishable and irrelevant to the matter at hand because of the different character of the parties. In *Formed Tubes*, an unsecured trade creditor was allowed to retain funds drawn on a Letter of Credit from a bank, which at the time of payment was fully secured, but after the bankruptcy filing, proved undersecured. The secured position was that of a third party and not the party creditor in the proceeding. The bank filed an unsecured claim in the proceeding. In our situation, the creditor at the time it delivered the order, was fully secured.

■ The purpose of allowing the exception for unsecured new value is that the estate is not diminished by payments for new value since unsecured inventory replaces the payment. Here, no unsecured new value was received since, on the date of delivery, the inventory was fully secured; the estate was diminished by the payment and not replenished by the new shipment, *In re Columbia Packing*, 44 B.R. 613 (Bankr.Mass.1984). In addressing the intent of this section and why it would be frustrated by secured claims, the Court, in *Formed Tubes*, stated, at 962:

... if the creditor obtains a security interest to secure payment of the new value or is paid for the new value by the debtor there is in effect no return of the preference and the section 547(c)(4) defense is not available to the creditor.

Clearly, TDK falls outside the exception and its argument proposing undersecurity runs counter to the intent of the new value exception.

■ TDK further asserts that the $204,-545.67 payment was made in the ordinary course of business under 11 U.S.C. § 547(c)(2). The original payment of these funds was made on August 28 1984 and returned for insufficient funds. Subsequently, on September 11, 1984, the debtor wire transferred the funds to TDK. The ordinary mode of payment by the debtor to TDK was check. A wire payment, within the context of the parties' relationship at the time, was outside of the ordinary course of business, *In re Craig Oil*, 785 F.2d 1563, 1568 (11th Cir.1986) (addressing payment by cashier's checks).

■ Once the trustee has established avoidable transfers under subsection (b), the creditor has the burden of proving the exception under subsection (c), the creditor has sustained that burden on all but the last two payments of $204,545.67 and $100,-000 which were not made in the usual course of business and were neither contemporaneous transactions nor new unsecured value.

Judgment is to issue on behalf of the trustee against TDK for $304,545.67 as a voidable and therefore recoverable preference.