In re METRO COMMUNICATIONS, INC., t/a Metrosports, Debtor.

MELLON BANK, N.A., Plaintiff,

v.

METRO COMMUNICATIONS, INC., t/a Metrosports, Debtor-in-Possession, and The Pacific–10 Conference, Defendants,

v.

The COMMITTEE OF UNSECURED CREDITORS, Intervenor.

Bankruptcy No. 85–552.
Adv. No. 86–104.

United States Bankruptcy Court, W.D. Pennsylvania.

Feb. 10, 1989.

Kenneth P. Simon, Simon & Simon, Pittsburgh, Pa., for intervenor, committee of unsecured creditors.

George M. Cheever, Kirkpatrick & Lockhart, Pittsburgh, Pa., for plaintiff, Mellon Bank, N.A.

Stephen J. Laidhold, Lampl, Sable, Makoroff & Libenson, Pittsburgh, Pa., for debtor.

Charles J. Vollmer, Pollard, Walker & Vollmer, Pittsburgh, Pa., for PAC–10 Conference.

Stephen I. Goldring, Pittsburgh, Pa., Asst. U.S. Trustee.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is Mellon Bank's ("Mellon") *Complaint to Determine Secured Status.*[1] The Committee of Unsecured Creditors ("Committee"), as Intervenor,[2] has answered said Complaint, averring that various transfers made to Mellon must be avoided for the benefit of the estate, as being preferential payments, fraudulent conveyances, and/or improvidently-made postpetition transfers. Specifically, the parties agree that Debtor's chief executive office moved from Rockville, Maryland to Pittsburgh, Pennsylvania, at some time between April 6, 1984 and March 15, 1985. Mellon's secured status depends upon a factual finding that the change in chief executive office occurred on or after October 5, 1984. The Committee challenges this contention, asserting that the move occurred much earlier than October 5, 1984, and that Mellon's security lapsed before the necessary financing statements were filed. Additionally, the Committee charges that the transactions involving Debtor and Mellon rendered Debtor insolvent and/or left Debtor with an unreasonably small capital, thereby constituting a fraudulent transfer. If findings to that effect were entered, certain postpetition adequate protection Orders, submitted by Debtor and Mellon, would of necessity be vacated as having been entered improvidently. Mellon denies these allegations, asserting, *inter alia*, that Debtor was neither rendered insolvent nor left with an insufficient capital base as a result of the transactions by and between the parties.

Trial was conducted with each party presenting in excess of sixty (60) exhibits; numerous witnesses were examined. The parties have briefed the issues, and have submitted proposed findings of fact and conclusions of law. After thorough analysis of the credible testimony, both oral and documentary, we find that Mellon is not a secured creditor, having failed to meet its burden of proof as to its perfected status. Therefore, any payments made to Mellon postpetition were and are inappropriate transfers. Additionally, any payments made within ninety (90) days prior to Debtor's bankruptcy filing were preferential payments and do not fall within any of the enumerated exceptions of § 547(c). Finally, we find that Debtor's guaranty of the Mellon loan to its parent was a fraudulent conveyance.

Debtor and Mellon will be directed to compile a complete and accurate accounting of all payments, made by Debtor to Mellon on behalf of itself or any of its related entities, or made by any other party to Mellon using Debtor's funds, and Mellon will be required to disgorge same, with legal interest from the date of receipt.

## FACTS

Debtor was a Maryland corporation, with its chief executive office at 6151 Executive Boulevard, Rockville, Maryland, 20852, and was in the business of television and radio sports syndication. With the exception of actual production, Debtor was engaged in all aspects of the business. most significantly in the acquisition of broadcast rights, and advertising sales. Debtor had its own officers and employees and was an autonomous organization.

1. This action constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), (K), and (O).

2. Defendants in this case, The PAC–10 Conference, have entered into a settlement agreement with Plaintiff. Approval of same by this Court has been held in abeyance pending the outcome of the instant proceedings.

In April of 1984, Debtor was acquired in a leveraged buyout by a holding company called Total Communications, Inc. ("TCI"), a wholly-owned subsidiary of Total Communication Systems, Co. ("TCS"). TCI was a shell corporation, having no assets or liabilities, and was created for the specific purpose of this transaction.[3] In order to conduct this transaction the parties entered into various loan, guaranty and suretyship agreements with Mellon. On April 6, 1984, TCI received a loan of $1,850,000.00 to finance its purchase of Debtor's stock; all of Debtor's present and future assets, including its stock, served as collateral for this loan. Debtor also executed a guaranty and suretyship agreement for this TCI loan.[4]

Debtor received a $2,300,000.00 working capital loan under a line of credit agreement, for which it was primarily liable, also dated April 6, 1984. TCI, TCS, and Mass Communication and Management, Ltd. ("MCM"), parent of TCS, guaranteed this loan; again, however, the actual security for this loan was Debtor's present and future assets. A formal security agreement between Debtor and Mellon was also executed on April 6, 1984. All of the above-mentioned documents, executed on April 6, 1984, were signed by Leonard L. Klompus ("Klompus") on behalf of Debtor, and Nelson L. Goldberg ("Goldberg") on behalf of TCI, TCS, and MCM. UCC–1 financing statements were filed in the appropriate state and local offices in Maryland. Those financing statements, dated *April 5*, 1984, the day prior to the actual loan transaction, were signed by *Goldberg* on behalf of *Debtor*.[5]

On September 7, 1984, Debtor and Mellon entered into a letter of credit agreement to finance Debtor's purchase of broadcast rights for the PAC–10 Conference football season. Draws upon these letters of credit created a demand loan between Mellon and Debtor. This loan was also secured by the security agreement executed April 6, 1984, and was guaranteed by TCI, TCS and MCM.

During the course of events following Debtor's acquisition by TCI, a transfer of power began to occur, from Klompus to Goldberg, from Rockville to Pittsburgh, until the Rockville office was closed and the employees therein, including Klompus, were released.

This transfer of power began gradually, and then proceeded rapidly. The seeds of its inception were planted even before the acquisition was finalized. In a letter dated February 28, 1984, from TCS counsel to Mellon, the union of Debtor and TCS was discussed in great detail. Apparently TCS was providing Mellon with an introduction to Debtor as an investment interest. The relationship is described as offering "... substantial opportunities for Nelson [Goldberg]." *Committee Exhibit 63*, and describing the importance of Debtor to TCS, as employing "... several experienced managers who will provide management depth for the *new organization*." *Id.* (emphasis added).

Additional insight into the transformation is provided by the "Employer's Quarterly Federal Tax Return" forms filed on Debtor's behalf. On April 3, 1984, before the acquisition occurred, William Eitze, Debtor's comptroller, prepared and filed said return from Rockville. However, the quarterly return dated July 31, 1984 is signed by Diana Acre, a TCS employee, situate in Pittsburgh. *Mellon Exhibit 16.* By July 30, 1984, Acre was the person authorized to file the quarterly employment reports with the State of Maryland, *Mellon Exhibit 15,* and the State of Califor-

---

**3.** The Mellon loan was originally made to TCS, and was approved in March 1984. Approximately ten (10) days after the transaction occurred, TCS was replaced with TCI as borrower. Said change was approved by Mellon.

**4.** At no time prior to the acquisition did TCI or TCS request an *audited* financial statement regarding Debtor's financial status.

**5.** It appears to this Court that even the *original* security interest may never have been properly perfected. When Goldberg executed the financing statement on behalf of Debtor, he was not yet connected to Debtor in any way. It is axiomatic that a financing statement is invalid unless *signed by the Debtor*. The financing statements signed on April 5, 1984, were *not* signed by Debtor.

nia tax returns, for the employee in the Los Angeles office. *Mellon Exhibit 19.*

In June of 1984 it became apparent that the controls were being passed from Maryland to Pennsylvania. By letter dated June 13, Eitze informed Martin Singer, a vice president at TCS, that he (Singer) would soon need to address certain financial relationships in Maryland. *Committee Exhibit 64.* Eitze was cognizant that he would soon be leaving Debtor's employ, and in fact, was gone by July 14, 1984.

Undoubtedly the metamorphosis was nearly complete on July 12, 1984, when Goldberg and Klompus issued a joint press release announcing the formation of TCS/Metrosports. In that announcement, the following explanation was offered:

> TCS/Metrosports will be *headquartered* out of TCS' New Kensington, PA location (just outside of Pittsburgh), and will *operate offices* in Rockville, MD; New York, NY; and Los Angeles, CA. Goldberg will serve as chairman of the board and chief executive officer. Klompus will serve as president.

*Committee Exhibit 65.* (emphasis added).

In August of 1984 Gail Schelat ("Schelat"), a former Mellon loan officer, became the Chief Financial Officer of both TCS and Debtor. Ms. Schelat's work station was Pittsburgh. On September 5, 1984 Schelat advised Mellon that the Debtor, TCS and Media Sales Corporation, the advertising arm of this conglomerate, would be sharing the use of a wholesale lock box, and that all customers would be advised of the change in procedure for remittance of accounts receivable. *Mellon Exhibit 67.* In fact, Debtor's invoices issued subsequently bore the following notice:

> Please Remit to:
> TCS/METRO
> P.O. BOX 371273
> PITTSBURGH, PA 15251

By October of 1984 Schelat had replaced Klompus in all but ministerial acts as regards the administration of Debtor. In fact, on October 3, 1984 Schelat, on behalf of Debtor, executed the Football Telecast Agreement between Debtor and the Naval Academy; this was the type of activity which was previously handled almost exclusively by Klompus. *Mellon Exhibit 24.* Two days later, Schelat wrote a letter to counsel for the Big East Conference, emphasizing the necessity for *her authorization* in all aspects of its relationships with TCS and Debtor.

> To ensure that everything proceeds smoothly and there are no misunderstandings I should be copied on all correspondence and *I must confirm* any agreements relating to our relationship, *in both TCS Productions and Metrosports.*

*Committee Exhibit 27.* (emphasis added).

When Debtor's bankruptcy was commenced on March 15, 1985, Schelat signed the Unsworn Declaration Under Penalty of Perjury, averring that Debtor had been a resident of Pennsylvania for the preceding 180 days, or since September 15, 1984.

The greatest overall indication of the change in the relationship between TCS and Debtor is the parallel change in the relationship between Goldberg and Klompus, as revealed in Klompus' weekly status reports to Goldberg. Supposedly, Klompus was merely required to provide Goldberg with a highlight of the week's activities; however, even the first report, dated April 20, 1984, provides insight that Klompus no longer had the last word:

> I have enclosed the University of Oklahoma bid spec for you ...
> As per your request, we successfully negotiated a 90–day termination ...
> Everything is on hold pending your meetings ...
> I need your approval regarding the 1984 PGA Southern Open Golf Tournament ...

*Committee Exhibit 5.*

Future reports eliminate any doubt that Klompus was working *for* Goldberg rather than *with* him. In his May 4, 1984 status report, he advised Goldberg of the team effort being made by him and the others in the Rockville office to meet Goldberg's projections:

... *we* are going to work very hard to increase the bottom line to the 30–40% that *you* are looking for.

*Committee Exhibit 6.* (emphasis added.)

By the middle of May, Klompus was speaking to Goldberg on a daily basis. *Committee Exhibit 7.* As time wore on, Klompus' reports became less executive and administrative, and more sales-oriented:

We worked today on getting all of the information in regards to the sales that you need.

*Committee Exhibit 8. See also, Committee Exhibit 10*, which highlights an extensive West Coast sales trip and contemplates weekly return visits. By July 20, 1984, Klompus' entire report dealt with sales. *Committee Exhibit 11. See also, Committee Exhibit 13*, wherein Klompus states:

I am now spending the majority of my day on sales, either with Media Sales or independently ...

Again, in my emphasis to selling, I have been spending most of my time doing that.

These weekly reports also indicate that by August of 1984 all contracts for trade and talent were being generated by TCS counsel and were being executed in Pittsburgh; Klompus, and the remaining Rockville staff, had resigned themselves to a lesser status:

Pursuant to our discussion on Monday, *your* decision on how to handle Media Sales at this point with *us* taking all of our time now in working in sales, *it is your decision on how to go.*

*Committee Exhibit 14.*

By September the Rockville office had no more executive authority; it was merely a large sales arm of the Pittsburgh hub.

The payments by and among the various parties fall into at least two (2) categories: prepetition payments within the preference period, and postpetition payments. During the ninety (90) days prior to the Debtor's bankruptcy filing, the following total payments were received by Mellon:[6]

| | |
|---|---|
| TCI Loan | $ 39,641.04 |
| Debtor–Line of Credit | 94,685.94 |
| Debtor–Demand Note | 26,263.35 |
| TCS Loans | 95,036.62 |
| | $255,626.95 |

After Debtor's bankruptcy filing, Mellon received the following payments:[7]

| | |
|---|---|
| TCI Loan | $ 133,378.20 |
| Debtor–Line of Credit | 155,139.85 |
| Debtor–Demand Note | 1,522,779.45[8] |
| TCS Loans | 260,961.21 |
| | $2,068,258.71 |

At this time we are unable to determine the precise amount actually paid from Debtor's funds as opposed to those funds which came from TCS. It does appear that a substantial sum was transferred postpetition from Debtor to TCS.[9]

## ANALYSIS

■ Mellon's Complaint was brought as an assertion of its secured status. It therefore has the burden of proving same by a preponderance of the evidence. We are initially directed by Mellon to the Uniform Commercial Code, as adopted in Pennsylvania, specifically 13 Pa.C.S.A. § 9103(c), which discusses the perfection of security interests in multi-state transactions. Mellon contends that its perfected secured status arises pursuant to § 9103(c)(4) and (5) which states in pertinent part as follows:

(4) A debtor shall be deemed located...., at his chief executive office if he has more than one place of business....

---

**6.** These numbers are based on figures provided in the parties' exhibits and may or may not be complete.

**7.** See Note 6.

**8.** Includes two Court-ordered "adequate protection" payments, dated October 24, 1985 and

February 10, 1986, which were based upon Consent Orders averring Mellon's secured status.

**9.** Debtor's accounting provided in the main bankruptcy case at Docket Number 204, dated July 25, 1986, indicates postpetition payments to TCS totaling $719,000.00, of which $155,850.00 is directly attributable to interest expense.

(5) A security interest perfected under the law of the jurisdiction of the location of the debtor is perfected until the expiration of four months after a change of the location of the debtor to another jurisdiction or until perfection would have ceased by the law of the first jurisdiction, whichever period first expires. Unless perfected in the new jurisdiction before the end of that period, it becomes unperfected thereafter and is deemed to have been unperfected as against a person who became a purchaser after the change.

There is no dispute that at the time of the April acquisition by TCI, the Debtor's chief executive office was located in Rockville, Maryland. It is also agreed that by the end of December, Debtor's chief executive office was situated in Pittsburgh, Pennsylvania. The issue at bar revolves around the date upon which this transfer occurred. If the move occurred on or after October 5, 1984, Mellon has a perfected security interest in all of Debtor's assets.[10] If the change of chief executive office occurred prior to October 5, 1984, Mellon's perfection would have lapsed, and the filing of financing statements in Pennsylvania would constitute a re-perfection, rather than a continuation of the earlier perfected status. The import of that distinction becomes clear when one realizes that the Pennsylvania UCC filings occurred within the ninety (90) days preceding Debtor's bankruptcy filing. Therefore, if the financing statements created a new perfection rather than a continued status, that new perfection would constitute a preferential transfer under the Bankruptcy Code, 11 U.S.C. § 547, and would be avoidable.

The Official Comments to Section 9-103 explain the phrase "chief executive office", which is otherwise undefined in the context of the UCC:

"Chief executive office" does not mean the place of incorporation; it means the place from which in fact the debtor manages the main part of his business operations. This is the place where persons

dealing with the debtor would normally look for credit information.

While very few courts have analyzed this issue, the Ninth and Tenth Circuits have rendered decisions, and reached their respective conclusions using very similar analyses. Both have rejected earlier decisions, such as *Tatelbaum v. Commerce Investment Co.,* 257 Md. 194, 262 A.2d 494 (1970), which relied almost exclusively on the "volume of business" test (i.e. the chief place of business is where the majority of the business is conducted.)

Significantly, it appears that both circuit courts place great weight on the change in the Code's language from "chief place of business" (original) to "chief executive office" (amended). *In re Golf Course Builders Leasing, Inc.,* 768 F.2d 1167, 1170 (10th Cir.1985); *In re J.A. Thompson & Sons, Inc.,* 665 F.2d 941, 950 (9th Cir.1982). Each Court notes that the focus has been realigned to "...the location which serves as *executive headquarters* for the debtor's multi-state operation, and not on the location which generates the largest business volume." *Id.* (emphasis added).

Both courts have also employed a two-part test to determine the location of a debtor's chief executive office, as developed from the earlier quoted language of the drafter's Committee Notes:

(1) from which place does the debtor *manage* the main part of its business operations; and

(2) where would creditors reasonably be expected to search for *credit information?*

*Golf Course,* 768 F.2d at 1170; *Thompson,* 665 F.2d at 949. (emphasis added).

Numerous factual indicia were considered by these courts in making their decisions; they can be categorized as follows:

(1) existence of office autonomy;

(2) location of officers and directors;

(3) office from which the annual report is generated;

**10.** However, even this conclusion is questiona-    ble—See note 5.

(4) location of financial records, including bookkeeping functions, tax preparation and maintenance of payroll;

(5) office from which business is negotiated and contracts are executed;

(6) location which generates greatest revenues;

(7) area in which majority of debtor's creditors are located; and

(8) location from which primary accounting and legal services are rendered.

In analyzing the instant case, these factors will be addressed seriatim.

### 1. Existence of Office Autonomy

At the time of Debtor's acquisition by TCI, the Rockville office was autonomous: it had its own officers, comptroller, financial and marketing staff. All decisions were made and finalized in Rockville, Maryland. Over time, from April through early October, Debtor's Rockville office suffered a loss of that autonomy. Goldberg and Schelat, Chief Executive Officer and Chief Financial Officer respectively, took gradual but steadily increasing control of the Debtor's business. Eitze, Debtor's comptroller, knew in June of 1984 that he would soon be released and was "laid off" in July. Thereafter, all accounting information was transmitted to the accounting department in Pittsburgh for processing. Schelat was hired in August; from that point forward, she and her staff handled the financial aspects of Debtor's business.

During that same time frame, April through early October, Klompus began to lose control over contract negotiation and decision making in general; with Schelat taking final authority for contracts and Goldberg making all major decisions, Klompus was reduced to an advertising salesman by the end of August. Goldberg began to lose faith in Klompus, and therefore, took his power away.[11] That Goldberg could in fact *take* the power is a prime indication that Rockville was no longer an autonomous office. To the contrary, the power and control were found in Pittsburgh, Pennsylvania.

### 2. Location of Officers and Directors

The major officers were effectively split between Pittsburgh and Rockville: Goldberg, the CEO and Chairman of the Board was located in Pittsburgh; Klompus, the President, was in Rockville; Schelat, the CFO, was situated in Pittsburgh; Cherner–Klompus and Karlsson, both vice presidents, were located in Rockville.

The weight of the evidence indicates that Goldberg and Schelat had the ultimate control well before October 5, 1984. As earlier noted, Klompus' weekly reports and daily conversations with Goldberg provide significant insight, as does Schelat's testimony that she was hired by Goldberg in August specifically to oversee and review Klompus' activities. Klompus pursued sales and ran various business errands in Rockville, Maryland; however, the management of the bulk of Debtor's business operations, and the only place to secure credit information, was found in Pittsburgh, Pennsylvania.

### 3. Annual Report Generation

No testimony was provided on this issue. We have no indication that any annual report was ever generated. The likelihood of same is reduced by the fact that the Debtor filed bankruptcy less than one year after the acquisition occurred. However, from the testimony and exhibits offered, it is clear to the Court that had such a document been considered, surely the "powers" of this corporation, located in Pittsburgh, would have made the decision whether or not to issue such a document, and would have had substantial input regarding substance and/or content. Some of the employees in Maryland would have supplied a portion of the information; however, its genesis and exodus would stem from Pittsburgh.

### 4. Location of Financial Records Including Bookkeeping, Taxes and Payroll

At the time of the April–1984 acquisition, all of Debtor's financial records were kept in Rockville, and were handled by Eitze.

---

**11.** At some time after December 14, 1984, a lawsuit was instituted against Klompus and others by Mass Communications and Management, TCS and TCI. That suit has since been dismissed.

When he left in July–1984, all financial duties were turned over to the Pittsburgh accounting office.

Schelat arrived in August–1984 and took primary responsibility for all financial aspects of Debtor's business including, but not limited to, accounts payable and receivable; general ledgers; and balance sheets and financial statements. Tax preparations were delegated by Schelat to other Pittsburgh staff, primarily William Jackson, controller, and Diana Acre, a bookkeeper.

We are unable to make a determination as to payroll preparation, in large part because the testimony was very limited. However, Schelat testified that her salary expense was shared between TCS and Debtor, although she was listed on TCS' payroll.

### 5. Office From Which Business Is Negotiated And Contracts Are Executed

Plaintiff attempted to give the impression that after the acquisition Klompus was still the Debtor and the Debtor was still Klompus. This conclusion is not supported by the credible factual data.

Originally Klompus handled all contract rights and most negotiations, with any legal aspects of same being channeled through Maryland counsel. As time progressed, Klompus was required to clear all negotiations through Goldberg, and often met or spoke with Goldberg before and after negotiating sessions. After Schelat was hired by Goldberg, in August of 1984, she became extensively involved in the negotiation process, and her approval was *required* on all contracts—even those previously negotiated by Klompus.

Additionally, TCS' counsel, Robert Krause, became more and more involved in negotiating and drafting contracts between Debtor and others; eventually, Krause handled all matters of legal import.

### 6. Location Which Generates Greatest Revenues

In April of 1984 Rockville generated all of the Debtor's revenues as all accounts were handled there. By early September a lock box arrangement had been installed with Mellon. All TCS, Metro, and Media Sales receipts were directed to said lock box and credited to appropriate parties. However, we have no real testimony as to which office *actually* generated the greatest revenues.

### 7. Location of Creditors

This item is not really applicable as Debtor had creditors all over the country (i.e. advertisers, individual schools, college conferences, television and radio stations) and ascertaining a central location is not feasible.

### 8. Location From Which Primary Accounting and Legal Services Are Rendered

The Debtor originally employed Maryland and Washington, D.C. attorneys and accountants to handle all legal and tax matters, with Eitze handling day-to-day financials "in house". After the acquisition by TCS, Krause began to perform all of the Debtor's legal work as it related to negotiations and contracts, with local Maryland counsel handling certain specific lawsuits and other various and sundry court proceedings.

Similarly, after the departure of Eitze, all accounting was transferred to Pittsburgh, with Schelat and her staff handling most financials and receiving outside tax and/or audit assistance from Touche Ross' Pittsburgh office.

Based upon the foregoing, it is clear that at least some time before October, and most apparently by late August, Debtor's "chief executive office" had moved from Rockville, Maryland to Pittsburgh, Pennsylvania. Therefore, Mellor's UCC–1 financing statements, filed in Pennsylvania on February 1st, 4th and 5th, 1985, did not operate to continue any perfected status; rather, said filing *re*-perfected Mellon's secured status.[12] Since this re-perfection

---

**12.** As stated *supra,* at Note 5, there is good cause to argue that Mellon was never properly perfected until the Pennsylvania filings occurred.

Since they are the avoidable preferential transfers, there may never have been proper perfection between Debtor and Mellon. For the pur-

constitutes a transfer of the Debtor's property, and since it occurred within ninety (90) days prior to Debtor's bankruptcy filing, Mellon's perfection is an impermissible preference and must be avoided. By the same analysis, any postpetition payments made pursuant to said perfected status, including but not limited to the court-ordered adequate protection payments, must be vacated and/or reversed as having been improvidently paid.

Mellon contends that it remains entitled to retain those payments made by Debtor within the ninety (90) day preference period; it claims that said payments fall within the exception found at § 547(c)(2), commonly called the "ordinary course" exception, which states as follows:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms; ...

The three (3) questions which are raised by this exception are properly phrased, in our present scenario, in the following manner:

(1) Was the *original* debt incurred in the ordinary course of business of both Debtor and Mellon?

(2) Were the payments by Debtor to Mellon during the ninety (90) day period, made in the ordinary course of business of both Debtor and Mellon?

(3) Were the payments by Debtor to Mellon during the ninety (90) day period made according to ordinary business terms?

See, *In re Vunovich,* 74 B.R. 629 (Bankr.D. Kan.1987).

In order to succeed on the exception, Mellon must supply this Court with a preponderance of proof, enabling affirmative answers to *all three* questions. *WJM, Inc. v. Massachusetts Dept. of Public Welfare,* 840 F.2d 996 (1st Cir.1988); *In re RDC Corporation,* 88 B.R. 97 (Bankr.W.D.La. 1988); *In re First Software Corp.,* 81 B.R. 211 (Bankr.D.Mass.1988); *In re Cleveland Graphic Reproduction, Inc.,* 78 B.R. 819 (Bankr.N.D.Ohio 1987); *In re Antinarelli Enterprises, Inc.,* 76 B.R. 247 (Bankr.D. Mass.1987).

While the answers to these questions rest in large part upon factual determinations, it is important to evaluate those facts with an eye toward the overall purpose of this exception, which is:

... to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 373 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5874, 6329. *See also, WJM, Inc., supra; First Software, supra; Cleveland Graphic, supra; In re Day Telecommunications, Inc.,* 70 B.R. 904 (Bankr.E.D.N.C.1987).

(1) Was the *original* debt incurred in the ordinary course of business of both Debtor and Mellon?

As a banking institution, Mellon makes loans on a daily basis for a multitude of purposes. It would therefore appear that all three (3) loans, i.e. the LBO/stock purchase, the working capital, and the PAC–10 letter of credit, were made in Mellon's ordinary course of business.

Whether these loans were made in Debtor's ordinary course of business is another question entirely. Debtor was in the broadcasting and advertising business; only if these loan transactions were normally conducted as part of Debtor's broadcast and/or advertising business should they be considered within the ordinary course of its business. *In re Daikin Miami Overseas, Inc.,* 65 B.R. 396 (Bankr.S.D.

pose of continuity, we refer to it above as "re-

perfection".

Fla.1986). Arguably, the letter of credit and working capital loans fall within this caveat, although it is unclear whether Debtor regularly borrowed funds for working capital or obtained letter of credit financing for broadcast right acquisitions. In any event, however, the LBO/stock purchase loan is highly extraordinary in nature and no company's borrowing to allow for the purchase of its own stock could ever be considered part of the ordinary course of its business.

(2) Were the payments by Debtor to Mellon during the ninety (90) day period, made in the ordinary course of business of both Debtor and Mellon?

As stated previously, the condition of Debtor's financial records leaves a great deal to be desired. However, through use of certain bank records, we are able to construct a pattern, if not a precise dollar figure. Each loan will be discussed separately for factual purposes.

The LBO/stock purchase loan was constructed to be paid on a monthly basis, with payments due on the 17th of each month. From May 1984 through September 1984 payments were made by Debtor each month, within two (2) weeks after the due date. The October 17, 1984 payment was not made until November 16, 1984. During the preference period, from December 15, 1984 through March 15, 1985, payments became very tardy and uneven. The November 17, 1984 billing was paid on January 1, 1985. The December 17, 1984 billing was paid on February 7, 1985. The January 17, 1985 and February 17, 1985 billings were paid in one lump sum on March 15, 1985, the day of the bankruptcy filing. This account was regularly paid by check; the March 15, 1985 payment was made by wire transfer.

LBO/Stock Purchase Loan Payments

| Payment Due | Payment Made | Amount Paid |
|---|---|---|
| 05–17–84 | 05–31–84 | $20,370.22 |
| 06–17–84 | 06–25–84 | 21,381.14 |
| 07–17–84 | 07–26–84 | 21,027.33 |
| 08–17–84 | 08–21–84 | 21,937.16 |
| 09–17–84 | 09–21–84 | 21,937.16 |
| 10–17–84 | 11–16–84 | 20,964.14 |
| 11–17–84 | 01–11–85 | 20,660.86 |
| 12–17–84 | 02–07–85 | 18,967.54 |
| 01–17–85 and 02–17–85 | 03–15–85 | 36,519.36 |

The working capital loan was also drawn to be payable on a monthly basis. Again the payment due date was the 17th of each month. Initially Debtor made all payments within nine (9) days after said due date. The October 1984 payment was one (1) month late and thereafter, during the preference period, payments were two (2) months in arrears. Two (2) payments were made in March 1985; the second was again sent by wire transfer on March 15, 1985, the date of the bankruptcy filing. The normal payment method on this loan was by corporate check.

Working Capital Loan Payments

| Payment Due | Payment Made | Amount Paid |
|---|---|---|
| 06–17–84 | 06–25–84 | $27,147.54 |
| 07–17–84 | 07–26–84 | 26,142.08 |
| 08–17–84 | 08–21–84 | 27,273.22 |
| 09–17–84 | 09–21–84 | 27,273.22 |
| 10–17–84 | 11–16–84 | 26,063.52 |
| 11–17–84 | 01–14–85 | 25,702.19 |
| 12–17–84 | 02–07–85 | 23,581.29 |
| 01–17–85 | 03–04–85 | 22,953.82 |
| 02–17–85 | 03–15–85 | 22,448.64 |

The bank's records relating to the letter of credit demand loan were far less complete; the only figures available relate directly to the preference period. The payment due date on this loan was the first day of each month. The payments for January 1, 1985 and February 1, 1985 were made on March 1, 1985 and March 15, 1985, respectively. The means by which the March 1, 1985 payment was made is unknown; however, Debtor's course of dealing was payment by check. Again, however, the March 15, 1985 payment was accomplished by wire transfer.

Letter Of Credit Demand Loan Payments

| Payment Due | Payment Made | Amount Paid |
|---|---|---|
| 01–01–85 | 03–01–85 | $ 8,247.94 |
| 02–01–85 | 03–15–85 | 18,015.41 |

Lateness of payments is a key factor in deciding whether payments fall within the parameters of the ordinary course of business exception. Several courts have held that untimely payments are outside the ordinary course of business and are therefore avoidable. *Marathon Oil Co. v. Flatau*, 785 F.2d 1563 (11th Cir.1986); *In re RDC Corp., supra.* In each case the payments which began as normal, regular, and ordinary course became sporadic and hurried.

Indeed, Mellon received at least $76,983.41 on the very day the bankruptcy was filed and an additional $31,201.76 within two (2) weeks prior thereto. While the payment on the working capital loan appeared to be "normal" in amount, the other payments made on that date were nearly twice that of a "regular" payment. Payments of unusual size and/or made in any unusual manner are also considered outside the ordinary course. *See Marathon Oil Co., supra; In re RDC Corporation, supra; In re Antinarelli Enterprises, Inc., supra; In re Vunovich, supra; In re Bourgeois,* 58 B.R. 657 (Bankr.W.D.La.1986).

(3) Were the payments by Debtor to Mellon during the ninety (90) day period, made according to ordinary business terms?

■ This element has been handled in two (2) different fashions by the Courts which have discussed this exception. The majority of said Courts limit their analysis to the manner and timing of payments between the individual parties. *See Matter of Unimet Corporation,* 85 B.R. 450 (Bankr.N.D.Ohio 1988), and cases cited therein. The minority approach is to examine this element from a broader perspective, i.e. determining the consistency of the parties' practices in relation to their industry counterparts. *Id.* The rationale for this view was aptly stated by the Court in *In re Steel Improvement Company,* 79 B.R. 681, 684 (Bankr.E.D.Mich.1987):

The difficulty with the majority approach is that either it ignores subparagraph (C) of Section 547(c)(2) and thereby makes it a nullity, or it interprets subparagraph (C) to require the same showing as subparagraph (B) and thereby makes it superfluous ...

Viewing subparagraph (C) as an element separate and distinct from subparagraph (B) is required. In the case at bar no testimony or evidence was offered regarding industry standards relating to payments in the ordinary course. Therefore, Mellon has not met its burden as to this element.

In summary then, the LBO/stock purchase loan fails to meet any of the criteria necessary to fall within the section 547(c)(2) exception. The other two loans fail to meet two of the three requirements. Therefore, the exception is inapplicable.

The Committee has raised a counterclaim in this adversary proceeding, asserting that the original acquisition of Debtor by TCI was a fraudulent conveyance, which must also be avoided. It has alleged violations of § 548(a)(2)(A) and (B)(i) or (ii), which states in pertinent part:

(a) The trustee may avoid ... any obligation incurred by the debtor, ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily— ...

(2)(A) received less than a reasonably equivalent value in exchange for such ... obligation; *and*

(B)(i) was insolvent on the date that ... such obligation was incurred, or became insolvent as a result of such ... obligation; [or]

(ii) was engaged in business ... or was about to engage in business ... for which any property remaining with the debtor was an unreasonably small capital; ...

■ We begin by asserting that Section 548 of the Bankruptcy Code is applicable to leveraged buyouts. The language of § 548 refers to *any* transfer, and a leveraged buyout is, by its very terms, a transfer of an interest in property. *See Matter of Ohio Corrugating Co.,* 70 B.R. 920 (Bankr. N.D.Ohio 1987). Additionally, § 548 parallels, in many respects, the Uniform Fraudulent Conveyances Act ("UFCA"), as adopted in Pennsylvania, 39 P.S. § 351 *et seq.* (Purdon's); and it appears that in most instances, those cases which analyze the various state law expressions of the UFCA will be applicable in cases brought specifically under § 548.

■ The burden of proving all elements of this allegation rests with the Committee, *In re Morris Communications NC Inc.,* 75 B.R. 619 (Bankr.W.D.N.C.1987); *In re Uhlmeyer,* 67 B.R. 977 (Bankr.D.Ariz.1986); *In re Coors of North Mississippi, Inc.,* 66 B.R. 845 (Bankr.N.D.Miss.1986); because

the allegations of § 548(a)(2) involve constructive fraud as opposed to actual fraud, the Committee must prove its elements by a preponderance of the evidence. In order to prevail, the Committee must prove the following:

1) the Debtor incurred an obligation;

2) the debt was incurred within one year prior to the bankruptcy filing;

3) in exchange for incurring the obligation, debtor received less than a reasonably equivalent value; and

4) the Debtor was either insolvent or severely undercapitalized on the transfer date, or was so rendered by the transfer.

*See In re Ohio Corrugating Co.*, 91 B.R. 430 (Bankr.N.D.Ohio 1988); *In re Butcher*, 72 B.R. 447 (Bankr.E.D.Tenn.1987).

The parties admit that Debtor incurred obligations on April 6, 1984, including the $2.3 million line of credit loan, and a guaranty of the $1.85 million loan incurred by its parent. The parties further agree that these obligations were incurred within one (1) year prior to Debtor's bankruptcy filing. Therefore, the Committee must prove that Debtor received less than a reasonably equivalent value for the obligations incurred *and* that Debtor was or became insolvent or undercapitalized.

The intent behind the fraudulent conveyance provision of the Bankruptcy Code is to preserve the estate assets for the benefit of the creditors. *See Matter of Ohio Corrugating Co.*, 70 B.R. at 927. In the instant case we find a group of loans to affiliated corporations along with cross-guaranties. Such guaranties can be categorized by three (3) different classifications:

A. a downstream guaranty, wherein the parent guarantees a subsidiary's obligation;

B. a cross-stream guaranty, wherein a subsidiary guarantees the obligation of its sister corporation; and

C. an upstream guaranty, wherein a subsidiary guarantees the parent's obligation.

*See Carl, Fraudulent Transfer Attacks on Guaranties in Bankruptcy*, 60 Am. Bankr.L.J. 109 (1986).

The instant case involves no cross-stream guaranties. Additionally, downstream guaranties, such as TCI, TCS and MCM's guaranties of Debtor's line of credit loan, are generally believed to be given for reasonably equivalent value, because the parent is the sole stockholder of the principal debtor, and any benefit received by the subsidiary is also a benefit to the parent. *In re W.T. Grant Co.*, 699 F.2d 599 (2nd Cir.1983); *In re Augie/Restivo Baking Co. Ltd.*, 87 B.R. 242 (Bankr.E.D.N.Y.1988); *In re Lawrence Paperboard Corp.*, 76 B.R. 866 (Bankr.D.Mass.1987). Upstream guaranties, on the other hand, are not very well protected. Transfers by a debtor which operate solely or principally to benefit an affiliated entity will constitute fraudulent transfers when the other elements of a fraudulent transfer are present. *Rubin v. Manufacturers Hanover Trust*, 661 F.2d 979 (2nd Cir.1981); *In re Lawrence Paperboard, supra; In re Holly Hill Medical Center, Inc.*, 44 B.R. 253 (Bankr.M.D.Fla. 1984). These same courts, and others, recognize that indirect benefits *may* furnish fair consideration, *provided*, however, that the value received by Debtor is *reasonably equal* to the value of the obligation given. *Rubin, supra; Klein v. Tabatchnick*, 610 F.2d 1043 (2nd Cir.1979); *Mandel v. Scanlon*, 426 F.Supp. 519 (W.D.Pa.1977); *Ohio Corrugating, supra; Lawrence Paperboard, supra.*

In the case at bar Debtor guaranteed a $1.85 million loan granted to its parent, TCI. TCI used said money to purchase Debtor's shares from Debtor's former shareholders. TCI collateralized the loan by pledging Debtor's stock, Debtor's guaranty and Debtor's security interest in all of its unencumbered assets. Debtor therefore has given up its stock and all other assets in exchange for $1.85 million of allegedly contingent debt. However, the contingent nature of said debt is illusory. TCI is a shell; a holding company. It had no assets of any kind except the Debtor, and the only means of debt repayment

which ever existed was assumption of the obligation by Debtor.

Mellon asserts that Debtor received *more* than reasonably equivalent value because it obtained a $2.3 million line of credit. Such circular logic merely begs the question, because all that Debtor really received was the opportunity to incur an additional $2.3 million of debt. If Debtor drew against the line of credit, and it did, Debtor would have a present cash asset. Debtor would also have a newly created identical liability, which would soon be greater than the asset due to accruing interest. It is clear that Debtor incurred an obligation for which it received *substantially less* than a reasonably equivalent value in exchange.

The only remaining element is Debtor's insolvency or undercapitalization. Many of the courts discussing this issue have developed complicated formulae and descriptions to determine if a debtor was insolvent or undercapitalized, or was so rendered by the transaction. Some analyze vast financial data in terms of "generally-accepted accounting principles." None of that is necessary in the instant case. By clear logic the very transactions themselves caused a *serious* case of insolvency, which has been defined under the Code as "when the sum of [its] debts is greater than all of [its] property, at a fair valuation." 11 U.S.C. § 101(31)(A). *See also, Ohio Corrugating,* 91 B.R. at 436; *In re Join-in International (USA) Ltd.,* 56 B.R. 555 (Bankr.S.D.N.Y. 1986).

On April 6, 1984, Debtor had a $1.85 million debt, for which it had pledged all of its assets and for which Debtor received no part of the actual $1.85 million. Debtor's former shareholders were paid $1.85 million in exchange for their shares of stock. If, as is often stated, fair market value is the sum a willing buyer will pay a willing seller in an arm's-length transaction, then Debtor's stock had a fair valuation of $1.85 million. Debtor pledged its stock *and* all of its remaining unencumbered assets as collateral for said $1.85 million loan guaranty. For all intents and purposes, Debtor was now liable for payment of the principal and interest on the loan, the proceeds of which it did not receive and the funding for which it did not have. A clearer case of insolvency would be difficult to construct.

Having found that the Committee has proved all of the necessary elements, we hold that the leveraged buyout among the parties to the action was a fraudulent conveyance which must be avoided.

An appropriate Order will be issued.

## ORDER OF COURT

AND NOW, at Pittsburgh in said District this 10th day of February, 1989, in accordance with the foregoing Memorandum Opinion of this date evenwith, it is hereby ORDERED, ADJUDGED and DECREED as follows:

(1) Plaintiff, Mellon Bank, does not possess a valid security interest in Debtor's assets;

(2) As a result thereof, Debtor and Mellon must compile a complete and accurate accounting of all payments made by Debtor to Mellon, on behalf of itself or any of its related entities, or made by any other party to Mellon, using Debtor's funds;

(3) Debtor and Mellon will file said accounting with the Court within sixty (60) days of the date of this Order;

(4) Concurrently with said filing, Mellon will disgorge the sums so discovered, with legal interest from date of receipt, to the Bankruptcy Court Registry.

IT IS FURTHER ORDERED that the original transaction among the parties, dated April 5 and/or 6, 1984, involving the leveraged buyout of Debtor's stock was a fraudulent transfer and BE and IS hereby AVOIDED.