KERR, District Judge.
 

 After examining the briefs and the appellate record, this three judge panel has determined that oral argument would not be of material assistance in the determination of this appeal. See Fed.R.App.P. 34(a), Tenth Cir.R. 10(e). The cause is, therefore, ordered submitted without oral argument.
 

 
 *1168
 
 The appellant, John B. Jarboe, Trustee for the bankrupt, Golf Course Builders Leasing, Inc., appeals from the decision of the district court reversing the ruling of the United States Bankruptcy Court for the Northern District of Oklahoma.
 

 The facts of the case are not in dispute and many facts were stipulated in the bankruptcy pretrial order. Golf Course Builders Leasing, Inc. (GCB) was incorporated in Colorado in 1975 and later became domesticated to do business in Oklahoma on May 6,1977 in connection with the filing of an unrelated lawsuit there. GCB was established by its sole shareholder, Lew Hammer, for the purpose of leasing heavy equipment to another corporation owned mainly by Hammer, Lew Hammer, Inc. (LHI). LHI was engaged in the business of general contracting and landscaping of golf courses.
 

 The golf course landscaping business soon became unprofitable, but the heavy equipment which GCB leased was adaptable to mining operations. GCB began using the equipment for coal mining in Oklahoma in September of 1976. At that time, the equipment was moved to Oklahoma on the mineral lease sites, with the exception of two pieces of equipment still located on a previous job site in Idaho. This equipment, too, was later moved to Oklahoma for use in the coal mining operations.
 

 In October of 1976, after mining operations had commenced, Lew Hammer and GCB obtained a loan from the United Bank of Denver (bank) in the amount of $50,000, providing to the bank as security an interest in GCB’s accounts receivable. In January of 1977, Hammer, on behalf of GCB, obtained further financing from the bank, executing a $750,000 promissory note. In March 1977, another promissory note was executed to the bank for $50,000. The notes were secured by accounts receivable and inventory belonging to GCB. This inventory consisted mainly of “mobile goods” and “mobile equipment,” as characterized by the Uniform Commercial Code. The funds were intended to be used in purchasing additional equipment for the mining operations and financing statements were timely filed by the bank in Colorado. On September 13, 1977 the bank filed additional financing statements in Oklahoma; however, on September 19, 1977 an involuntary bankruptcy petition was filed by GCB creditors seeking that GCB be declared bankrupt.
 

 Pursuant to an agreement entered into in August of 1977 between GCB and Petroleum Reserve Corporation, GCB sold its equipment in October of 1977, with proceeds totaling $710,070.50. These proceeds were placed with the bank in accordance with a court approved stipulation. The proceeds from GCB’s receivables amounted to $77,900, which the trustee held after collection. The trustee filed a complaint in bankruptcy court alleging that the bank was not entitled to the proceeds from the sale of the mobile equipment because it had not perfected its security interest in Oklahoma until after it had become aware of GCB’s insolvent status.
 

 With regard to the perfection of a security interest under the Uniform Commercial Code of both Colorado and Oklahoma, the provision concerning the conflict of laws on “mobile goods” is identical for each state. That language provides:
 

 (2) If the
 
 chief place of business
 
 of a debtor is in this state, this Article governs the validity and perfection of a security interest and the possibility and effect of proper filing with regard to general intangibles or with regard to goods of a type which are normally used in more than one jurisdiction (such as automotive equipment, rolling stock, airplanes, road building equipment, commercial harvesting equipment, construction machinery and the like) if such goods are classified as equipment or classified as inventory by reason of their being leased by the debtor to others. Otherwise,
 
 the law
 
 (including the conflict of laws rules)
 
 of the jurisdiction where such chief place of business is located shall govern.
 
 If the chief place of business is located in a jurisdiction which does not provide for perfection of the
 
 *1169
 
 security interest by filing or Recording in that jurisdiction, then the security interest may be perfected by filing in this state.
 

 Okla.Stat. tit. 12A, § 9-103(2) (1972); Colo. Rev.Stat. § 4-9-103(2) (1973) (emphasis added).
 

 The bankruptcy court in construing Okla. Stat. tit. 12A, § 9-103(2), held that the “chief place of business” of GCB was Oklahoma, and that, therefore, Oklahoma was the proper place for filing financing statements and perfecting the bank’s security interests in the mobile goods. Thus, the Colorado filings by the bank were ineffective. Further, the bankruptcy court held that the filings made by the bank in Oklahoma only a few days before bankruptcy proceedings were instituted constituted a voidable preference since the bank had reasonable cause to believe GCB was insolvent at the time.
 

 Other portions of the bankruptcy court’s holding concerning other security interests are not before this court on appeal.
 

 The district court in reversing the decision of the bankruptcy court, found that the determination of “chief place of business” under § 9-103(2) was a question of law and that the bankruptcy court had erred in finding GCB’s “chief place of business” to be Oklahoma. The district court held that as Colorado was GCB’s “chief place of business,” the bank had properly perfected its security interests in Colorado and should, therefore, have been adjudged a secured creditor. The district court never reached the voidable preference issue.
 

 The questions then presented to this court are: (1) Whether the “clearly erroneous” standard of review is applicable to the bankruptcy court’s determination of GCB’s “chief place of business;” (2) whether the “chief place of business” of GCB is in Oklahoma or Colorado; and, (3) whether the Oklahoma filings by the bank constitute a voidable preference.
 

 The appellant contends that the district court erred by not applying the “clearly erroneous” standard of review of Rule 52(a), Fed.R. of Civ.P., and Bankruptcy Rule 810 to the findings of the bankruptcy court. The appellant argues that the determination of “chief place of business” is a question of fact and that the bankruptcy decision should have been allowed to stand because it was not clearly erroneous.
 

 It is true that the district court is bound to accept the findings of the bankruptcy court unless they are clearly erroneous.
 
 Moran Bros., Inc. v. Yinger,
 
 323 F.2d 699 (10th Cir.1963). However, it is also true that the “clearly erroneous” standard does not apply to questions of law or mixed questions of law and fact.
 
 Stafos v. Jarvis,
 
 477 F.2d 369 (10th Cir.1973). Where, as here, the facts are not in dispute and the findings of fact are not challenged, the reviewing court is only concerned with the legal conclusions to be drawn from the facts as found.
 
 Colorado Springs Nat’l Bank v. United States,
 
 505 F.2d 1185, 1189 (10th Cir.1974).
 

 We agree with the district court that here the determination of GCB’s “chief place of business” is a question of law, there being no dispute as to the facts. Furthermore, we conclude that the bankruptcy court erred in its legal conclusion that Oklahoma was the “chief place of business” because it misconstrued § 9-103(2), thus failing to apply the correct legal standard.
 

 The bankruptcy court relied heavily and almost solely on the “volume of business” test set forth in
 
 Tatelbaum v. Commerce Investment Co.,
 
 257 Md. 194, 262 A.2d 494 (1970), 7 U.C.C. 406 (1970), in concluding that Oklahoma was GCB’s “chief place of business.” In
 
 Tatelbaum,
 
 the court determined that “chief place of business” under Maryland’s § 9-401 relating to the rec-ordation place of financing statement was analagous to that under § 9-103 and that it meant the place where the corporate debtor conducted the greatest volume of business activity.
 
 Tatelbaum,
 
 262 A.2d at 498. The bankruptcy judge, after reviewing the facts, concluded that GCB conducted its greatest volume of business in Oklahoma
 
 *1170
 
 and that Oklahoma was, therefore, the “chief place of business.”
 

 In the present case, it is undisputed that GCB’s volume of business was greatest in Oklahoma. However, we agree with the district court’s reliance on the Ninth Circuit case of
 
 In re J.A. Thompson & Son, Inc. v. Shepherd Machinery Co.,
 
 665 F.2d 941, 949-950 (9th Cir.1982), that volume of business may be a factor but it cannot be the only factor in determining “chief place of business.”
 

 The official comments to code section 9-108 are important in providing guidance as to what the drafters of the code intended as the “chief place of business” for multi-state operators. The official comment by the drafters of the Uniform Commercial Code § 9-108, comment 3 provides in part:
 

 ‘Chief place of business’ does not mean the place of incorporation: it
 
 means the place from which in fact the debtor manages the main part of his business operations.
 
 This is the
 
 place where persons dealing with the debtor would normally look for credit information, and is the appropriate place for filing.
 
 The term ‘chief place of business’ is not defined in this Section or elsewhere in this Act. Doubt may arise as to which is the ‘chief place of business’ of a multi-state enterprise with decentralized, autonomous regional offices. A secured party in such a case may easily protect himself at no great additional burden by filing in each of several places. Although under this formula, as under the accounts receivable rule stated in subsection (1), there will be doubtful situations, the subsection states a rule which will be simple to apply in most cases, which will make it possible to dispense with much burdensome and useless filing, and which will operate to preserve a security interest in the case of non-scheduled operations,
 

 (emphasis added).
 

 The court in
 
 Thompson,
 
 relying on this official comment, concluded that the drafters of the code “contemplated a two-fold-inquiry focusing first on the ‘place from which ... the debtor manages the main part of his business operations,’ and second, on the reasonable expectations of creditors.”
 
 In Re Thompson,
 
 665 F.2d at 949. Recognizing that confusion could emanate from use of the concept “debtor’s place of management,” the
 
 Thompson
 
 court examined the later revision of § 9-103 which utilizes the phrase “chief executive office.” Oklahoma, too, has adopted this newer version of the code which states that “(d) a debtor shall be deemed located at his place of business if he has one; at his
 
 chief executive office if he has more than one place of business;
 
 otherwise at his residence_” Okla.Stat. tit. 12A, § 9-103. l(3)(d) (emphasis added). This subsequent amendment and its legislative history, while not controlling, should be given some weight in the construction of the earlier statute.
 
 Glidden Co. v. Zdanok,
 
 370 U.S. 530, 541, 82 S.Ct. 1459, 1468, 8 L.Ed.2d 671 (1962).
 

 As the
 
 Thompson
 
 court noted, the focus is then placed on “the location which serves as executive headquarters for the debtor’s multi-state operation, and not on the location which generates the largest business volume.”
 
 In re
 
 Thompson,. 665 F.2d at 950. The court suggested this creates stability in debtor-creditor relations because a chief executive office is much less likely to change location than changes which could result in the various volumes of business activity at different locations.
 

 With regard to the second step of the inquiry concerning the reasonable expectations of the creditors, the Oklahoma comment provides that the purpose behind the rule “is that the state of the debtor’s chief place of business is the place an interested party is likely to go for information.” Okla.Stat. tit. 12A, § 9-103 comment sub-sec. 2. This is similar to the official comment which speaks in terms of where an interested party “would normally look for credit information.”
 

 Thus, we are persuaded that the analysis used by the
 
 Thompson
 
 court is a sound approach to determining “chief place of business” under § 9-103 and that the
 
 *1171
 
 courts of Oklahoma, if faced with the issue of construing the phrase, would, like the district court, adopt the two-fold test of
 
 Thompson.
 

 The undisputed facts of this case demonstrate that during the period of GCB’s operations, Lew Hammer maintained the office for LHI at 2385 South Lipan Street, Denver, Colorado. From this office Hammer largely conducted the business of GCB. Hammer conducted much of the negotiations and business transactions for GCB from this Denver office, spending only an average of two days per week in Oklahoma supervising the mining operations there. There was no permanent office in Oklahoma for GCB. Rather, temporary office locations existed at each mine site; these temporary office locations in turn moved with the mining operations. All officers and directors of GCB were located in Colorado, and on the Oklahoma domestication certificate, Lew Hammer was named as the registered agent, listing his home address in Colorado.
 

 All the financial records of GCB were maintained at the Denver office, including accounts receivables and invoices. Invoices were paid' by the Denver office, even though at times they may have first been sent to a mine site office for approval by the mining supervisor. The payroll of GCB was prepared in the Denver office and forwarded to the mine site offices in Oklahoma. All monthly, quarterly, and annual reports were prepared at GCB’s office in Denver and all of GCB’s accountants were located in Colorado. GCB acquired all of its liability and worker’s compensation insurance through the Denver office and much of the equipment owned by GCB was purchased or leased by Hammer through the Denver office.
 

 Applying this two-fold inquiry, we agree with the district court that the conclusion to be drawn from these facts is that GCB’s place of management and executive office was in Colorado. Furthermore, creditors seeking information would have likely looked to Lew Hammer, the president and key manager of GCB, who mainly worked and lived in Colorado and had access to GCB’s financial records in Colorado.
 

 We hold that Colorado was GCB’s “chief place of business” and that the district court was correct in so concluding. Thus, the bank properly perfected its security interests in the “mobile goods” or equipment in Colorado. It is, therefore, unnecessary to reach the voidable preference issue concerning the filings made in Oklahoma.
 

 The decision of the district court is, therefore,
 

 AFFIRMED.