**MELLON BANK, N.A., Appellant in No. 91–3160,**

v.

**METRO COMMUNICATIONS, INC. t/a Metrosports, debtor-in-possession, and The Pacific 10 Conference**

v.

**The COMMITTEE OF UNSECURED CREDITORS, Intervenor in District Court,**

**Grant Street National Bank (in liquidation), Appellant in No. 91–3105.**

**Nos. 91–3105 and 91–3160.**

United States Court of Appeals, Third Circuit.

Argued July 8, 1991.

Decided Sept. 25, 1991.

As Amended Sept. 26, Oct. 1 and Oct. 28, 1991.

George M. Cheever, (Argued), Kirkpatrick & Lockhart, Pittsburgh, Pa., for Grant Street Nat. Bank.

Denise K. Chamberlain (Argued), Mellon Bank, N.A., Pittsburgh, Pa., for Mellon Bank, N.A.

Phillip S. Simon (Argued), Kenneth P. Simon, Simon & Simon, Pittsburgh, Pa., for Committee of Unsecured Creditors.

Before STAPLETON, HUTCHINSON, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal, arising in the context of a failed leveraged buyout, had its roots in the congenial climate of mergers and acquisitions that beguiled corporate America during the decade of the nineteen-eighties. The appeal raises important questions regarding a bankruptcy trustee's avoidance

powers under 11 U.S.C. §§ 547(b) and 548(a)(2) of the bankruptcy code. The debtor is Metro Communications (Metro), the corporation acquired in the leveraged buyout. Mellon Bank, N.A. (Mellon or Bank) financed the acquisition; Mellon lent the acquiror 1.85 million dollars to purchase all of the capital stock of the target corporation, Metro. Metro guaranteed and secured the acquisition loan with substantially all of its assets. Simultaneously with the leveraged buyout, Mellon extended a 2.3 million dollar credit line to Metro. At a later date, Mellon extended another 2.25 million dollars to Metro in the form of letters of credit. These loans were also collateralized by the security interest in substantially all of Metro's assets. Within a year of the leveraged buyout, Metro filed a bankruptcy petition under chapter 11.

The bankruptcy court held that Mellon's security interest in the three loans constituted a voidable preference under 11 U.S.C. § 547(b), finding that Mellon's security interest lapsed because it failed to re-file financing statements within four months of Metro's change in the location of its headquarters and that the refiling of the financing statements at the debtor's new location during the ninety day period preceding the filing of the bankruptcy petition constituted a voidable preference. Furthermore, the court held that Metro's guaranty of the acquisition loan and the execution of a security interest in connection therewith constituted a fraudulent conveyance under 11 U.S.C. § 548(a)(2). We reverse.

## I.

Metro Communications, also known as Metrosports, the debtor, had been in the business of television and radio sports syndication for about ten years prior to its bankruptcy. Metro, incorporated in Maryland in 1972, originally had its headquarters in Rockville, Maryland. Its business included acquiring the rights to broadcast sporting events, contracting with radio and television stations for such broadcasts, and selling rights to advertise during the broadcasts.

In April of 1984, Metro's stockholders sold all of their capital stock to Total Communications, Inc. (TCI), a wholly owned subsidiary of Total Communication Systems Co. (TCS). The principals of TCI created it solely for the purpose of acquiring the stock of Metro and becoming its sole shareholder. TCS, in turn, is the wholly owned subsidiary of Mass Communication and Management, Ltd. (MCM). These affiliated corporations were in the business of syndicating and producing television programs of college athletic events. TCS owned and operated mobile television production studios used in the broadcasting of athletic events nationally.

TCI acquired Metro for the purpose of creating a synergy of complementary services; Metro, as the buyer and seller of broadcasting rights, contracted regularly with companies, such as TCS, to produce and broadcast the athletic events. The two companies, TCS and Metro, developed a joint marketing concept known as TCS/Metro, and issued press releases and other promotional materials which stressed that the companies were working as a joint venture, joining their strengths and "working as a team."

To finance the purchase of the Metro stock, TCI borrowed $1,850,000 from Mellon on April 6, 1984. On the same day, Mellon loaned Metro $2,300,000 for use as working capital under a line of credit agreement. Pursuant to guaranty and suretyship agreements dated April 6, 1984, TCI guaranteed the repayment of the loan to Metro, Metro guaranteed the repayment of the loan to TCI, and TCS and MCM jointly guaranteed the repayment of both loans.

In addition to the guarantees, Metro entered into an agreement dated April 6, 1984, with Mellon Bank wherein Metro conveyed to the Bank a security interest in substantially all of Metro's property, including its general intangibles and accounts receivable. The security agreement provided that the collateral secured "all ... indebtedness, obligations and liabilities of [Metro] to the Bank, now or hereafter existing, including but not limited to those

arising under the Guaranty, and those arising under the Metrosports Loan Agreement."

On September 7, 1984, Metro and Mellon entered into a Letter of Credit Agreement to finance Metro's purchase of broadcast rights for the PAC–10 Conference football season. The Letter of Credit Agreement provided that Mellon's reimbursement rights were secured under the April 6, 1984 security agreement between Mellon and Metro and guaranteed by TCI, TCS, and MCM. Between December 18, 1984 and January 2, 1985, Mellon disbursed the full $2,250,000 face amount of the letters of credit in response to the PAC–10's drawing requests. The following chart summarizes the loans received and guaranties made by Metro:

| TRANSACTION | DATE | AMOUNT |
| --- | --- | --- |
| Guaranty of Acquisition Loan | 4/6/84 | $1,850,000 |
| Working Capital Line of Credit | 4/6/84 | $2,300,000 |
| PAC–10 Letter of Credit | 12/18/84 | $2,250,000 |

The Bank perfected its security interests in the collateral pledged by Metro by filing UCC–1 financing statements in the Maryland State Department of Assessment and Taxation on April 9, 1984 and the Clerk's Office of the Circuit Court of Montgomery County, Maryland, on April 17, 1984. The Bank filed additional UCC–1 financing statements in the appropriate offices in Pennsylvania on February 1 to and including February 5, 1985.

On March 12, 1985, PAC–10 filed a complaint against Metro, TCS, and various related entities in the United States District Court for the Northern District of California, alleging breaches of various agreements covering the broadcasting of PAC–10 basketball and football games. Simultaneously with the filing of the complaint, PAC–10 obtained an *ex parte* order which permitted pre-judgment attachment of Metro's assets. Pursuant to the order, PAC–10 attached certain outstanding accounts receivable of Metro. Three days later, on March 15, 1985, Metro filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.

On January 30, 1986, the Bank filed an adversary proceeding against Metro and PAC–10 to determine the validity, priority, and extent of the Bank's security interest and to ascertain the parties' respective rights in an escrow account which PAC–10 had attempted to attach. The Official Unsecured Creditor's Committee ("the Committee") intervened, claiming that the Bank had received preferential transfers pursuant to 11 U.S.C. § 547(b) and that a fraudulent conveyance had occurred pursuant to 11 U.S.C. § 548(a)(2).

PAC–10, Metro and the Bank have agreed to a settlement of their disputes over the escrow account and have presented their settlement to the bankruptcy court for approval. The bankruptcy court has stated that it will defer ruling on the proposed settlement until this appeal is resolved.

### *Prior Court Proceedings*

After a two-day bench trial, the bankruptcy court on February 10, 1989, filed an opinion and order holding that the Bank's security interest in Metro's assets was voidable under 11 U.S.C. § 547(b) and that Metro's guaranty of the acquisition loan and the grant of the security interest was a fraudulent conveyance under 11 U.S.C. § 548(a)(2). *In re Metro Communications, Inc.*, 95 B.R. 921 (Bankr.W.D.Pa. 1989). The court ordered the Bank and Metro to file an accounting, showing all amounts subject to disgorgement. In October of 1988, after the bench trial but before the bankruptcy court filed its decision, Mellon assigned all its claims against Metro to Grant Street National Bank (GSNB), which is now in liquidation. On February 17, 1989, counsel for Mellon and GSNB (to-

**640**

gether, the Banks) filed a motion to amend the February 10, 1989 order under Rule 59(e) of the Federal Rules of Civil Procedure. That motion, filed on behalf of GSNB as successor in interest to Mellon, sought to exclude from the scope of the bankruptcy court's order payments made by Metro to Mellon with respect to loans made directly to Metro from Mellon more than 90 days prior to Metro's bankruptcy filing.

On February 27, 1989, GSNB filed its Notice of Unconditional Assignment of Claim to it by Mellon Bank. The bankruptcy court issued a second order on April 4, 1989, permitting GSNB to intervene in the adversary proceeding as an additional plaintiff and amending its February 10, 1989 order in accordance with the relief requested. On April 10, 1989, the Banks filed their notice of appeal in the district court.

In a third order, dated May 15, 1989, the bankruptcy court expressly directed the entry of a final judgment on its prior order of February 10, 1989, as amended April 4, 1989, and certified it under Fed.R.Civ.P. 54(b) for appeal to the district court, stating that certification was in the interest of fostering a speedy, economical and orderly resolution of the appeal. The Banks filed a supplementary joint notice of appeal within 10 days after the docketing of this May 15 order.

On February 12, 1991, the district court entered an order affirming the bankruptcy court's rulings in all respects except for the award of pre-judgment interest. Mellon and GSNB each appealed to this court; we consolidated the appeals.

## II.

### A. *Jurisdiction*

■ The threshold question that must be answered is whether this court possesses jurisdiction to hear this appeal. The Committee argues that both this court and the district court lacked jurisdiction because of the failure to file a timely appeal. The Committee contends that the motion to amend judgment filed on February 17, 1989, did not serve to toll the ten-day peri-

od for filing a notice of appeal from the bankruptcy's February 10, 1989 order. The Committee claims that, consequently, the notice of appeal filed on April 10, 1989, was untimely.

The Committee alleges that the motion to amend was ineffective because GSNB filed it as a successor in interest to Mellon Bank. The Committee argues that GSNB cannot be considered a "party in interest" because it filed its notice of unconditional assignment with the bankruptcy court only after filing the motion to amend and also after the expiration of the ten-day appeal period.

The Banks correctly point out that this argument turns on the mistaken premise that the February 10, 1989 order constituted a final judgment and thus the ten-day appeal period began on that date. However, the February 10, 1989 order was not a final judgment. Mellon Bank instituted the original suit against PAC–10. The February 10th order did not purport to settle Mellon's claims as to PAC–10 and thus the judgment was not final as to all claims and as to all parties as required for appeal. *See Andrews v. United States*, 373 U.S. 334, 340, 83 S.Ct. 1236, 1239–40, 10 L.Ed.2d 383 (1963) (rule of finality requires that the judgment be final as to all parties as well as causes of action to be appealable). Indeed, the bankruptcy court has deferred ruling on the settlement of Mellon, Metro, and PAC–10 pending the resolution of this appeal.

The February 10th order became appealable only when the bankruptcy court certified it pursuant to Federal Rule of Civil Procedure 54(b) (made applicable to bankruptcy proceedings by Bankruptcy Rule 7054). The Banks filed a supplementary joint notice of appeal within ten days of the bankruptcy court's certification. Thus, regardless of whether GSNB had standing to file a motion to amend the February 10th order, the district court, as well as this court, had jurisdiction to hear the appeal.

### B. *Voidable Preference Under Section 547*

■ The bankruptcy court concluded that Mellon Bank's security interest sup-

porting the three loans—the acquisition loan, the working capital loan, and the letter of credit loan—constituted a voidable preference under 11 U.S.C. § 547(b). The court determined that the perfection of this security interest constituted a voidable preference because Mellon untimely refiled its financing statements in the debtor's new location.

The purpose of section 547 of the Bankruptcy Code is to prevent preferences of certain creditors so that the debtor's assets may be fairly distributed among all creditors, not merely those that are favored. *Kapela v. Newman,* 649 F.2d 887 (1st Cir. 1981). Section 547 provides, in relevant part, that:

the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owned by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition ...

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Assuming, for the moment, that the perfection of a security interest constitutes a transfer of an interest of the debtor in property, the crucial issue in the present case is whether the perfection occurred within the 90 day period prior to the filing of the bankruptcy petition.

■ Whether the transfer occurred within the 90 day period turns on whether Mellon untimely refiled its security interest in Pennsylvania. 13 Pa.C.S.A. § 9103(c) governs the perfection of security interests in multi-state transactions. In pertinent part, it provides:

(4) A debtor shall be deemed located ... at his chief executive office if he has more than one place of business ...

(5) A security interest perfected under the law of the jurisdiction of the location of the debtor is perfected until the expiration of four months after a change of the location of the debtor to another jurisdiction or until perfection would have ceased by the law of the first jurisdiction, whichever period first expires. Unless perfected in the new jurisdiction before the end of that period, it becomes unperfected thereafter and is deemed to have been unperfected as against a person who became a purchaser after the change.

The parties agree that at the time of the leveraged buyout, Metro had its chief executive office in Rockville, Maryland. Mellon filed in the appropriate offices in Maryland in April of 1984, thus perfecting its security interest. The issue is whether Mellon's refiling in Pennsylvania was within four months of the Metro's transfer of its chief executive office to Pittsburgh.

If the debtor moved its headquarters to Pennsylvania on or after October 5, 1984, Mellon's security interest in Metro's assets remained perfected. If the change of the chief executive office occurred prior to October 5, 1984, the lien of Mellon's statements would have lapsed, and the filing statements in Pennsylvania would constitute a reperfection rather than a continuation of the earlier perfected status. If the refilings constituted a reperfection, that new perfection occurred within the 90 day period of section 547 and is thus vulnerable to attack.

■ The bankruptcy court determined that Metro moved its office "at least some time before October, and most apparently by late August." This court reviews the bankruptcy court's findings of fact under a clearly erroneous standard, whereas its conclusions of law are subject to plenary review. *In re Jersey City Medical Center,* 817 F.2d 1055, 1059 (3rd Cir.1987). However, mixed questions of law and fact, such as the ultimate determination of when and what constituted a relocation of the chief

executive offices of a corporation, is a conclusion of law or, at least, a mixed question of law and fact. We are therefore not limited to the "clearly erroneous" standard, but must exercise a mixed standard of review. We accept the trial court's finding of historical or narrative facts unless clearly erroneous, but exercise "plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3rd Cir.1981).

■ The preliminary and significant legal question that must be discussed is the allocation of the burden of proof. The bankruptcy court explicitly placed the burden of proving that Mellon's security interest did not constitute a voidable preference under section 547 on Mellon. The court reasoned that because Mellon's complaint asserted its secured status, it therefore had the burden of proving the same by the preponderance of the evidence. Although this statement is in and of itself correct, the bankruptcy court failed to realize that Mellon had satisfied that burden of proof by showing it properly filed financing statements made in Pennsylvania prior to the debtor's filing under Chapter 11. *See* 11 U.S.C. § 502(a).

The bankruptcy court erred in holding that Mellon had to prove that its security interest was *not* a voidable preference under section 547 in order to establish its secured status. This ruling is in direct contravention with the allocation of the burden of proof statutorily provided for in section 547(g) which states that *"the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section."* 11 U.S.C. § 547(g) (West Supp.1991) (emphasis supplied). The bankruptcy court's erroneous legal conclusion that Mellon had the burden of proof to sustain the validity of its security interest under section 547 materially permeated its factual findings.

Turning to the bankruptcy court's factual findings as to when Metro moved its chief executive office, it appears that the court utilized the correct definition. The

Official Comments to section 9–103 explains that the "chief executive office does not mean the place of incorporation; it means the place from which in fact the debtor manages the main part of his business operations. This is the place where persons dealing with the debtor would normally look for credit information." Courts have used this language to develop a two-part test to determine the location of a debtor's chief executive office:

(1) from which place does the debtor manage the main part of its business operations; and

(2) where would creditors reasonably be expected to search for credit information?

*In re Golf Course Builders Leasing, Inc.,* 768 F.2d 1167, 1170 (10th Cir.1985); *In re J.A. Thompson & Son, Inc.,* 665 F.2d 941, 949 (9th Cir.1982).

The bankruptcy court's application of this definition, however, is questionable. The Banks rightly criticize the court's mechanistic application of factors deemed relevant in other cases. *See In re Golf Course Builders,* 768 F.2d at 1170; *In re J.A. Thompson,* 665 F.2d at 949. The Official Comment to section 9–103 envisions a realistic test asking simply "where does the debtor manage the main part of its business" because that is where creditors are likely to search for information. To artificially break down that question into rigidly applied tests violates the practical nature of the inquiry as envisioned by the Uniform Commercial Code.

■ The Banks correctly point out that when one corporation is acquired by another, the nature of the inquiry as to the location of the chief executive office must necessarily be tailored to that situation. Ascertaining the location of the headquarters of a wholly-owned subsidiary necessarily differs from determining the location of the chief executive office of a single corporation. Re-examining the evidence presented below with more illumination than that enjoyed by the bankruptcy court, it becomes apparent that the bankruptcy court basically concluded that Metro, over time, came under the control of its parent

corporation, TCS, and thus Metro's headquarters became those of TCS. This conclusion is neither legally nor factually accurate.

■ The bankruptcy court's analysis is flawed in several respects. First, there is a presumption that a corporation, even when it is a wholly owned subsidiary of another, is a separate entity. The law recognizes the legal distinction of affiliated corporations as do business people. To require creditors to analyze and understand the internal power structure of related corporations to determine whether the wholly owned subsidiary was "truly independent" from its parent corporation is misplaced and would introduce great uncertainty into commercial transactions, especially with respect to the filing of financing statements.

The inappropriateness of the focus of the bankruptcy court's inquiry is underscored by the evidence it relied upon. The court found relevant internal memoranda allegedly revealing the "transfer of power [that] began gradually, and then proceeded rapidly." To require creditors to scrutinize internal documents to determine the "reality" of the power structure of affiliated corporations is impractical, imprudent, and unwarranted. If, as it must be, the focus of the inquiry is shifted from analyzing the relationship between the parent corporation and its subsidiary to where Metro, the debtor, in fact had its headquarters, overwhelming evidence supports the conclusion that Metro's chief executive office remained in Rockville, Maryland until it announced the transfer in the press in December of 1984.

As previously stated, Metro's business was the acquisition of syndication rights to sporting events as well as the sale of advertising. The bankruptcy court did not find that the activities of obtaining contracts and selling advertising were no longer centered in the Rockville office, but that these activities, over time, became subject to the final approval of Goldberg, the CEO and Chairman of the Board located in Pittsburgh.[1] The court stated that "[b]y September the Rockville office had no more executive authority; it was merely a large sales arm of the Pittsburgh hub." 95 B.R. at 926. Once again, however, to require the creditors of a corporation to speculate as to who is calling the final shots is impractical and irrelevant. The "main part" of Metro's activities was the acquisition of syndication rights and the sale of advertising; this activity remained centered in the Rockville office until it was closed in December of 1984.

Much evidence readily available to creditors and of a more objective nature demonstrated that Metro maintained its headquarters in Rockville until December of 1984. Most importantly, contracts for syndication rights list Rockville as the principal office as late as October 5, 1984. Tax forms filed in the beginning of 1985 list Rockville as the headquarters. Metro's own letterhead lists Rockville as headquarters until December 1, 1984. Representatives of athletic conferences and colleges continued to deal directly with the Rockville office at least through early October 1984. On October 5, 1984, the Big East Conference wrote to Gail Schelat, the chief financial officer of both TCS and Metro, confirming contract negotiations. That letter, however, was addressed to the Rockville office. All of this evidence strongly supports Rockville as the "place where persons dealing with the debtor would normally look for credit information." Official Comment to § 9–103.

The only relevant piece of evidence in support of the court's conclusion that Metro's headquarters moved prior to October 5, 1984, was the July 12, 1984, newspaper announcement that stated that "TCS/Metrosports will be headquartered out of

---

1. The evidence does show that accounting and financial services were consolidated in the Pittsburgh office shortly after the leveraged buyout. However, the location of these services is secondary to the main business of Metro corporation—obtaining syndication rights and selling advertising. Thus, the location of these services is not determinative. Moreover, it has become common practice for affiliated corporations to consolidate financial services for the corporate group in one location. The whereabouts of this streamlined accounting service does not give us much information about the location of the headquarters for each corporation.

TCS's New Kensington, PA location." However, this announcement meant only that joint ventures embarked on by the newly related corporations would be coordinated out of the Pennsylvania location. Moreover, the effective date is not stated. The language used is telling—that the joint ventures will be "headquartered out of *TCS's New Kensington, PA location.*" Even this announcement did not imply that Metrosports, a separate corporate entity, had an office in New Kensington. Indeed, on the next page of the announcement, Metrosports' location is listed as Rockville, MD.

Finally, the most telling piece of evidence is not even mentioned by the bankruptcy court. On November 19, 1984, Metro announced that TCS/Metrosports was consolidating its operations and that accordingly, Metro's headquarters, "previously in Rockville, Maryland" were being moved to Pittsburgh *"effective on December 3, 1984,"* and that "the firm expect[ed] to complete its consolidation of office and staff ... by December 31, 1984." (Emphasis supplied). Thus, the bankruptcy court's conclusion is directly contrary to the debtor's public announcement as to the location of its own headquarters.

In sum, the bankruptcy court's conclusion that *Metro* shifted its headquarters "at least some time before October" is fraught with error. First, the court impermissibly shifted the burden of proof. Second, the court engaged in an irrelevant inquiry as to the internal balance of power between corporate executives and whether the subsidiary corporation operations were controlled by the parent corporation. Third, the court ignored considerably critical evidence that Metro continued to handle negotiation of syndication contracts,

Metro's central line of business primarily out of the Rockville office until at least October 5, 1984. Finally, the court disregarded the news release stating that Metro's headquarters would be moved on December 3, 1984. For these reasons, we conclude that the bankruptcy court erred in its mixed finding of fact and conclusion of law that Metro's headquarters moved "at least some time before October." [2]

In any event, we need not decide the question whether the reperfection of a security interest in Pennsylvania during the 90 day preference period could be susceptible to attack under section 547(b) in light of our holding that the bankruptcy court erred in its ultimate mixed finding of fact and conclusion of law that the debtor's headquarters moved prior to October 5, 1984.

## C. *Fraudulent Transfer Under Section 548(a)(2)*

■ The bankruptcy court held that Metro's guaranty and the security interest collateralizing the guaranty of the 1.85 million dollar loan to TCI which was used to buy out Metro's shareholders constituted a fraudulent conveyance under 11 U.S.C. § 548(a)(2). It is unclear whether the bankruptcy court meant this to be an alternative holding to its voiding of Mellon's security interest under section 547. At any rate, we must reach this question in light of our decision that the security interest did not constitute a voidable preference.

The present law of fraudulent conveyances has ancient roots. Section 548 is derived from the Statute of 13 Elizabeth passed by Parliament in 1571. The statute was aimed at a practice by which overburdened debtors placed their assets in friendly hands thereby frustrating creditors' at-

---

**2.** Moreover, the Committee did not put forth any evidence to satisfy the other required element of section 547, namely, that the creditor received more than it would have under the circumstances of section 547(b)(5). Subsection (b)(5) requires that the trustee show that the transfer had the effect of giving the creditor a greater return on his debt than would have been the case had the transfer not taken place and there had been a distribution under the liquidation provisions of the Bankruptcy Code. *In*

*re Rude,* 122 B.R. 533, 535 (Bkrtcy E.D.Wis. 1990). In the present case, it is likely that a security interest would give Mellon Bank a distinct advantage over what it would otherwise receive in a hypothetical chapter 7 liquidation distribution, yet, the bankruptcy court failed to discuss this issue. Under these circumstances, it appears that the Committee has not satisfied its statutorily provided burden of proof as to all the required elements of section 547(b).

tempts to satisfy their claims against the debtor. After the creditors had abandoned the effort to recover on their claims, the debtor would obtain a reconveyance of the property that had been transferred. Such transactions operated as a fraud against the debtor's creditors because the debtor's estate was depleted without exchanging property of similar value from which the creditors' claims could be satisfied.

The current embodiment of the law of fraudulent conveyances, section 548(a) provides, in full, that:

the trustee may avoid any transfer of an interest of the debtor in property, that was made or incurred on or within one year before the date of filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(b)(i) was insolvent on the date that such transfer or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Subsection (a)(1) deals with actual fraud; the trustee is required to prove actual intent to defraud the debtor's creditors. Subsection (a)(2) addresses constructive fraud; the fraud on the creditors will be presumed if certain objective criteria are met. In this case, the Committee has made no allegations of intentional fraud. There is no evidence of any intention on the part of the parties to hinder or delay creditors or to commit any fraud. The bankruptcy court here held that Metro engaged in constructive fraud within the terms of section 548(a)(2).

At first glance, it seems difficult to reconcile the original purpose of the fraudulent conveyance laws with what has become a common, arms-length transaction—the leveraged buyout, or in business parlance, the LBO. Where there exists no intentional fraud, setting aside the security interest of a lender who has indisputably *given* reasonably equivalent value, cash for a promise to repay a loan, appears to be a patent anomaly. As one commentator has stated, "[a] firm that incurs obligations in the course of a buyout does not seem at all like the Elizabethan deadbeat who sells his sheep to his brother for a pittance." Baird & Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 Vand.L.Rev. 829, 852 (1985). Nonetheless, a thorough understanding of the typical LBO transaction reveals that there is a potential for abuse of the debtor's creditors, particularly those who are unsecured, when a company is purchased through an LBO.

Although the formal structure of LBOs may differ, the substance of LBOs follow a general pattern. A leveraged buyout refers to the acquisition of a company ("target corporation") in which a substantial portion of the purchase price paid for the stock of a target corporation is borrowed and where the loan is secured by the target corporation's assets. Commonly, the acquiror invests little or no equity. Thus, a fundamental feature of leveraged buyouts is that equity is exchanged for debt.

TCI's acquisition of the target Metro followed the typical pattern: Mellon extended a loan of 1.85 million dollars to TCI for the purchase of Metro; Metro guaranteed the loan and secured it with its assets, thus significantly adding to its debt structure. TCS and MCM, the parent and grandparent corporations of TCI also guaranteed the acquisition loan.

The effect of an LBO is that a corporation's shareholders are replaced by secured creditors. Put simply, stockholders' equity is supplanted by corporate debt. The level

of risk facing the newly structured corporation rises significantly due to the increased debt to equity ratio. This added risk is borne primarily by the unsecured creditors, those who will most likely not be paid in the event of bankruptcy. The lender, which normally assumes a senior, secured position vis-a-vis other creditors, is at risk only to the extent that the loan is under-collateralized. An LBO may be attractive to the buyer, seller, and lender because the structure of the transaction could allow all parties to the buyout to shift most of the risk of loss to other creditors of the corporation if the provisions of section 548(a)(2) were not applied.

The selling shareholders receive direct benefit in the LBO transaction as they are cashed out, usually at a price above the price the shares were trading shortly before the acquisition is announced. The new purchaser also benefits from the transaction by thereby achieving ownership of the corporation. The lender is attracted by the higher interest rates and fees usually associated with LBOs. The target corporation, however, receives no direct benefit to offset the greater risk of now operating as a highly leveraged corporation. As legal scholars have noted, the target firm may not at all reflect the Elizabethan deadbeat, but may in fact wind up as the sacrificial lamb. Wahl & Wahl, *Fraudulent Conveyance Law and Leveraged Buyouts*, 16 William Mitchell L.Rev. 343, 353 (1990).

The reasonableness of the remedy provided by section 548(a)(2) has been questioned. *See, e.g.*, Carlson, *Leveraged Buyouts in Bankruptcy*, 20 Georgia L.Rev. 73 (1985) (lenders should have good faith defense of section 548(c) despite language requiring lender to have given value to the debtor). However, because the fraudulent conveyance laws are intended to protect the debtor's creditors, a lender cannot hide behind the position, although sympathetic, that it has parted with reasonable value. The purpose of the laws is estate preservation; thus, the question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors. *But cf., In re Greenbrook Carpet Co.,*

*Inc.,* 722 F.2d 659, 661 (11th Cir.1984) (court held that although bank knew that corporation would immediately re-lend proceeds of the loan to principal shareholders to purchase a company in return for unsecured note, the issue under section 548 was "whether the *bank* received more consideration than it was due"); *Kupetz v. Wolf,* 845 F.2d 842, 847 (9th Cir.1988) (court refused to apply section 548(a)(2) to force selling shareholders to disgorge the payments they received where there was no indication of actual intent to defraud and no knowledge of the LBO structure used to purchase their shares).

Moreover, the statutory language provides no exception for the leveraged buyout transaction. Section 548 applies to "any transfer of an interest of the debtor in property." The definitional section of the Act states that transfer means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(54). This definitional language is sufficiently broad to encompass a leveraged buyout transaction that falls within its terms. We therefore turn to the analysis of the particular requirements of section 548.

### Reasonably Equivalent Value

Section 548(a)(2)(A) requires the trustee to show that the debtor received "less than a reasonably equivalent value." Because Metro did not receive the proceeds of the acquisition loan, it did not receive any direct benefits from extending the guaranty and security interest collaterizing that guaranty. However, in evaluating whether reasonably equivalent value has been given the debtor under section 548, indirect benefits may also be evaluated. If the consideration Metro received from the transaction, even though indirect, approximates the value it gave TCI, this can satisfy the terms of the statute. *See Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 991 (2nd Cir.1981) (although transfers solely for the benefit of third parties do not furnish fair consideration, the transaction's benefit to the debtor need

not be direct and may come through a third party). These indirect economic benefits must be measured and then compared to the obligations that the bankrupt incurred. Here, as well as in determining insolvency under section 548(a)(2)(B)(i), it is appropriate to take into account intangible assets not carried on the debtor's balance sheet, including, *inter alia*, good will. *See Mutual Life Ins. Co. v. Menin*, 115 F.2d 975, 977 (2d Cir.1940), *cert. denied*, 313 U.S. 578, 61 S.Ct. 1096, 85 L.Ed. 1536 (1941) (debtor's good will is property asset which may be sold in bankruptcy proceedings); *see also In re Da–Sota Elevator Co.*, 939 F.2d 654, 656 (8th Cir.1991). The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred. Thus, when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received.

The bankruptcy court rejected Mellon's argument that one of the indirect benefits that Metro received as a result of the LBO was the ability to borrow working capital from Mellon. The court reasoned that the 2.3 million dollar credit line extended contemporaneously with the 1.85 million dollar loan to TCI amounted to a *liability* because "all that Debtor really received was the opportunity to incur an additional $2.3 million of debt." The court concluded that because of accruing interest, Metro received "substantially less than a reasonably equivalent value in exchange." 95 B.R. at 934. This analysis is flawed. The ability to borrow money has considerable value in the commercial world. To quantify that value, however, is difficult. Quantification depends upon the business oppor-

tunities the additional credit makes available to the borrowing corporation and on other imponderables in the operation or expansion of its business.

The bankruptcy court also did not account for the value created by the LBO itself. The Banks cite what appears to be legitimate and reasonable expectation that the affiliation of these two corporations, TCS and Metro, would produce a strong synergy. Through the LBO, Metro established a permanent relationship with a production company with highly sophisticated equipment and an experienced and reputable production and technical staff. The complementary nature of the two corporations' businesses would appear to create a stronger and more profitable combination. What was unpredicted, however, was the Supreme Court's decision in *National Collegiate Athletic Assoc. v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), which Mellon points to as the reason for Metro's dramatic and unforeseen decline. Mellon alleges that the Court's holding that certain NCAA restrictions imposed on the broadcasting of college football games of member NCAA institutions violated antitrust laws had the unexpected result of increasing competition and severely decreasing revenues from advertising. The problem universal to all LBOs—transactions characterized by their high debt relative to equity interest—is that they are less able to weather temporary financial storms because debt demands are less flexible than equity interest.

Thus, the indirect benefits to Metro of this guaranty were the ability to obtain substantial credit due to its new association with the TCS corporate group and the synergy expected to result from the combination of these corporations.[3] The value,

---

**3.** John L. Phillips, a consultant in the telecommunications industry and a certified public accountant formerly employed by Price, Waterhouse & Co., who actively assisted with the management of Total Communications, Inc., explained the benefits to be derived by the companies involved in the LBO. Speaking specifically about the benefits to be derived by Metro, he testified:

The benefits to Metro again were quite clear. Metro had a history of having to negotiate for facilities ... and by having a facility like Total Communications Systems ... it had a reputation of being—of having state of the art quality production equipment and it also had a reputation of having better than average production—quality production people. So this would add to Metrosports in terms of being able to in some cases upgrade the quali-

however, of the synergy obtained in the corporations' affiliation and the value of obtaining the credit are difficult to quantify in dollars without the aid of expert witnesses. Regrettably, no such testimony was forthcoming in this case.

The value of consideration received must be compared to the value given by the debtor to determine whether the debtor received less than reasonably equivalent value. The bankruptcy court correctly found that the contingent nature of the debt was illusory because TCI had no assets of any kind except the debtor. The parties do not dispute that TCI was merely a shell corporation formed for the sole purpose of acquiring Metro. All parties, including the lender, assumed that Metro would be servicing the debt.

However, the court ignored the value of guarantees made by TCS and MCM. In valuing the cost of Metro's guaranty, the right of contribution from co-guarantors needs to be balanced against the amount of debt for which Metro is liable. Carl, *Fraudulent Transfer Attacks on Guaranties in Bankruptcy*, 60 Amer.Bank.L.J. 109, 114 (1986) ("If there are multiple guarantors of the same obligation, the right of contribution entitles a paying guarantor to have its co-guarantors pay it their proportionate share of the principal debt it paid.") Thus, the value of the guaranty, 1.85 million dollars, must be reduced to the extent contribution was available at the time of the loan from Metro's co-guarantors.

No evidence, however, has been offered regarding the value of these rights to contribution. We do know that the assets of the guaranteeing corporations were sufficiently valuable to justify an immediate additional loan by Mellon to TCS of 2.3 million dollars and letters of credit for an additional 2.25 million dollars. These loans enabled Metro, as demonstrated by its bal-

ance sheet of June 30, 1984, immediately to achieve a very sharp rise in its broadcasting rights amounting to a grand total of $26,240,705. Although the ability to obtain credit is the lifeblood of the commercial world and governmental operational survival, and the synergystic strength expected from the merger here, no doubt had value, the Committee introduced no evidence to support its burden of showing that Metro received less than reasonably equivalent value in exchange for its guaranty and security interest. The Committee acted on the blind assumption that they had no value and the bankruptcy court agreed.

*Insolvency or Undercapitalization*

Under section 548, not only must the Committee prove that the debtor did not receive reasonably equivalent value, the Committee must also prove that the debtor was "insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer." 11 U.S.C. § 548(a)(2)(B)(i). The bankruptcy court swiftly concluded that Metro was rendered insolvent by the LBO, stating that clear logic showed that "the very transactions themselves caused a *serious* case of insolvency." 95 B.R. at 934.

The bankruptcy code defines insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(31)(A). This test is frequently described as the "balance sheet test." The debtor's assets and liabilities are tallied at fair valuation to determine whether the corporation's debts exceed its assets. Under section 548, insolvency is to be measured at the time the debtor transferred value or incurred an obligation. In present case, Metro's solvency must be measured on April 6, 1984, the date on

ty of its production work associated with its programming and in other cases establishing a consistency of quality because of being able to use in many respects the same people. This is very valuable to any syndicator or someone who owns rights, programming rights. It's very valuable in terms of being able to go to advertisers, okay, and to stations

and be able to say, I'm going to be able to deliver you a consistency of quality of production. The other aspect of benefit to Metrosports, you don't have to be a genius to see, it received working capital.
Q. Through the loans from Mellon Bank?
A. Right. Which, of course, proved to be needed.

which Metro guaranteed the acquisition loan.

The bankruptcy court reasoned that the LBO rendered Metro insolvent because it assumed that the 1.85 million paid to the former shareholders of Metro reflected the fair market value of Metro and that Metro's pledge of its stock and assets in equal amount necessarily rendered it insolvent. The court stated:

> Debtor's former shareholders were paid $1.85 million in exchange for their shares of stock. If, as is often stated, fair market value is the sum a willing buyer will pay a willing seller in an arm's-length transaction, then Debtor's stock had a fair valuation of $1.85 million. Debtor pledged its stock *and* all of its remaining unencumbered assets as collateral for said $1.85 loan guaranty. For all intents and purposes, Debtor was now liable for payment of the principal and interest on the loan, the proceeds of which it did not receive and the funding for which it did not have. A clearer case of insolvency would be difficult to construct.

*In re Metro*, 95 B.R. at 934. Thus, the court concluded in one short paragraph that the transaction rendered Metro insolvent. Not only is the bankruptcy court surprisingly cavalier in fashioning what amounts to a *per se* rule that LBO loans collateralized with the target's assets are fraudulent, the court's analysis is flawed by several fundamental errors.

First, even assuming that Metro's fair market value was 1.85 million dollars, the guaranties of TCS and MCM should have been counted as reducing Metro's liability to something below 1.85 million dollars. Second, the court erred in stating that Metro "pledged its stock *and* all of its remaining unencumbered assets." Metro, of course, cannot, and did not, pledge its own

stock as the corporation's stock was held by another entity—TCI. The bankruptcy court thus, in essence, double counted when it stated that Metro pledged stock as well as assets. For these reasons, as well as reasons we discuss below, the bankruptcy court's superficial analysis fails to show that the guaranty of the acquisition loan rendered Metro insolvent.

■ The record is sparse with respect to the financial condition of Metro at the time of the two loans on April 6, 1984, of 1.85 million dollars to accomplish the stock purchase and 2.3 million dollars for working capital. James Canavan, assistant vice-president of Mellon, testified that the loans would not have been made without the guaranty and surety agreements of TCM and TCS. Although we do not have a financial statement of Metro for April 6, 1984, Metro's corporate income tax return with accompanying balance sheet for the period ending April 16, 1984, shows the total assets of the company and liabilities without the Mellon loans of April 6, 1984. The income tax return, prepared on a cash basis, does not report accounts receivable or accounts payable and, therefore, is incomplete. Nonetheless, it does reflect that the corporation had a net worth of $133,873 at the time and was not insolvent. Thus, it appears that the purchaser of the capital stock of Metro paid primarily for goodwill.[4] In the absence of any evidence as to the value of the accounts receivable and the sum owing on the accounts payable, and no proof of the value of Metro's rights to contribution, one cannot determine on this record whether the guaranty of the 1.85 million dollar loan and the accompanying security interest rendered the corporation insolvent.

---

4. Goodwill is the difference between the value of the consideration given and the fair market value of the Company's identifiable net assets. E.R. Brownslee, K. Ferrs, M.C. Haskins, *Corporate Financing Reporting*, 144 (1990).

Although the purchaser obtained little value in tangible assets, TCI secured much more in solid expectations of the Company's future potential after the infusion of needed working capital and the benefits of the synergism effectuated by the

permanent combination of three operating companies, MCM, TCS, and Metro. As for Mellon, apparently it looked for collateralization of its loans to its security interest in Metro's potential profits after the synergistic effects of the combination of the corporations and the infusion of new working capital and, most importantly, to the guaranty and surety agreements of MCM and TCS, not to the security interest in Metro's limited assets.

When we examine the balance sheet of June 30, 1984, prepared on an accrual basis, after the ingestion of 2.3 million dollars working capital and the expansion of the company's broadcasting rights, we find accounts receivable of $1,828,016 and accounts payable of $762,745. The corporations' assets have now shot up to an aggregate $28,370,697 consisting primarily of broadcasting rights, and its liabilities amounted to $27,684,167, comprised principally of obligations under its broadcast rights and bank loans of $3,500,000. The net worth of the company shows improvement—now $343,265—despite the liability of the bank loans and demonstrates that the Mellon loans did not render Metro insolvent, even without considering the value of the guarantees of TCS and MCM, but improved its financial condition.

We conclude that the Committee failed to satisfy its burden of proving that Metro was insolvent on the date of the transfer or became insolvent as a result of the transfer. As the Committee did not raise the issue of unreasonably small capital or the debtor's intent to incur debts beyond its ability to pay, we need not discuss these issues. Thus, we hold that the guaranty and security interest securing the acquisition loan did not constitute a fraudulent conveyance as provided by section 548 of the bankruptcy code.

### III.

In sum, we conclude that the bankruptcy court erred in its conclusion that the debtor's chief executive office was relocated prior to October 5, 1984, and thus Mellon's refiling of its financing statements in the debtor's new location did not constitute a voidable preference under section 547(b). We also hold that the Committee failed to satisfy its burden of proof in showing that Metro failed to receive reasonably equivalent value when it executed the guaranty and security interest of the acquisition loan and that the loan rendered it insolvent under section 548(a)(2). Accordingly, the order of the district court will be reversed insofar as it affirms the order of the bankruptcy court of February 10, 1989, as amended, and the case will be remanded to the district court with instructions to reverse the foregoing order of the bankruptcy court. Costs taxed to the appellees.